# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

NATHAN OWEN,                                    )
                                                )
          Plaintiff,                 )
                                                )
          v.                         )   C.A. No. 8860-CB
                                                )
LYNN CANNON, BRYN OWEN, ENERGY                  )
SERVICES GROUP, INC., a Delaware                )
corporation, and ESG ACQUISITION CORP.          )
(n/k/a Energy Services Group, Inc.), a Delaware )
corporation,                                    )
                                                )
          Defendants.                )

## MEMORANDUM OPINION

Date Submitted: March 17, 2015
Date Decided: June 17, 2015

Kenneth J. Nachbar, D. McKinley Measley and Shannon E. German of MORRIS, NICHOLS, ARSHT & TUNNELL LLP, Wilmington, Delaware; *Attorneys for Plaintiff*.

Edward M. McNally, P. Clarkson Collins, Jr., Lewis H. Lazarus, Jason C. Jowers and Patricia A. Winston of MORRIS JAMES LLP, Wilmington, Delaware; *Attorneys for Defendants*.

**BOUCHARD, C.**

## I.   INTRODUCTION

In this joint fiduciary duty and appraisal action, Nathan Owen ("Nate"), formerly the largest stockholder of Energy Services Group, Inc. ("ESG" or the "Company"), challenges a conflicted merger (the "Merger") in which he was cashed-out of ESG in May 2013, for the right to receive $19.95 per share, or $26.334 million in total. The Merger was orchestrated by the Company's two other largest stockholders: Lynn Cannon, who replaced Nate as President in August 2009, and Bryn Owen ("Bryn"), Nate's brother. The Merger price was derived from a valuation that ESG's financial advisor performed based on five-year projections (the "2013 Projections") prepared under Cannon's direction, which projections the Company submitted to a nationally reputable lender in order to obtain a $25 million credit facility to buy out Nate.

Nate and his financial expert accept the 2013 Projections that formed the basis for the Merger price, but they argue that the $19.95 per share price is unfair because ESG's financial advisor applied certain incorrect assumptions in its valuation, the most significant of which is the tax rate applicable to ESG as a Subchapter S corporation. Applying what he submits are the correct assumptions to the 2013 Projections, Nate contends that the fair value of his stock was $53.46 million.

Although defendants were content to use the 2013 Projections at the time of the Merger, they now insist that those projections are not sufficiently reliable to value Nate's stock. Instead, they rely on a valuation based on a set of ten-year projections their financial expert created in the midst of this litigation. Based on their expert's valuation, which applies a corporate tax rate for ESG that disregards its status as a Subchapter S

corporation at the time of the Merger, defendants contend that the fair value of Nate's stock was no more than $21.502 million.

The two primary areas of disagreement between the parties concern which projections to use for a discounted cash flow (DCF) analysis to value Nate's stock as of the Merger, and whether to tax affect the earnings in that analysis to account for ESG's status as a Subchapter S corporation. In this post-trial opinion, I conclude that it is appropriate to use the 2013 Projections because they reflected management's best estimate of what was known or knowable about ESG's future performance as of the Merger. I also conclude, consistent with this Court's precedents, that it is appropriate to tax affect the earnings in the DCF analysis given ESG's status as a Subchapter S corporation. Based on these two conclusions, and certain other determinations discussed below, I find that the fair value of Nate's shares was $42,165,920 as of the Merger.

## II. BACKGROUND

These are the facts as I find them based on the documentary evidence and testimony of record.[1] I accord the evidence and testimony the weight and credibility that I find it deserves.

---

[1] The deposition testimony of witnesses is part of the trial record to the extent that testimony was used at trial. In addition, the deposition of ESG's controller, Lisa Swift, who did not testify at trial, is part of the record. Tr. of Oral Arg. 202-03. Objections to any testimony or joint exhibits are overruled to the extent that testimony or exhibits are used in this opinion.

## A. The Parties

Plaintiff and Petitioner Nathan Owen was the President of ESG until his removal in August 2009, and a director of the Company until the Merger. Before the Merger, Nate held 1,320,000 shares of ESG stock, which were cancelled in the Merger in exchange for the right to receive $19.95 per share in cash, or $26.334 million in total. Nate currently resides in Maine.

Defendant Lynn Cannon served as a director of the ESG and as President "pro tem" after Nate's removal as President.[2] Before the Merger, Cannon held 1,218,750 shares of ESG stock. In connection with the Merger, Cannon became President of ESG.

Defendant Bryn Owen, Nate's brother, is a Vice President and director of ESG. Before the Merger, Bryn held 1,098,750 shares of ESG stock.

Non-party Felimon Gurule is the Vice President of Information Technology at ESG. Before the Merger, Gurule held 112,500 shares of ESG stock.

Respondent Energy Services Group, Inc., a Delaware corporation based in Norwell, Massachusetts, provided services to the retail energy industry. At all relevant times before the Merger, Nate, Cannon, and Bryn were the three members of the Company's board of directors, and Nate, Cannon, Bryn, and Gurule were stockholders of the Company. In connection with the Merger, Cannon, Bryn, and Gurule transferred their ESG stock to Defendant ESG Acquisition Corp. ("Acquisition Corp."), a Delaware corporation, in exchange for an equal amount of Acquisition Corp. stock. In the Merger,

---

[2] Trial Tr. ("Tr.") 152 (Cannon).

3

ESG merged with and into Acquisition Corp., which is now known as Energy Services Group, Inc.[3] Unless noted otherwise, I refer to Energy Services Group, Inc. and Acquisition Corp. interchangeably as "ESG" or the "Company," and I refer to Cannon, Bryn, and Acquisition Corp. as "Defendants."

## B. The Formation of ESG

In the mid-1990s, Nate started a website- and intranet-development company called IC Solutions, which was the predecessor to ESG.[4] Bryn joined IC Solutions and reported to Nate.[5] In the late 1990s, one of the country's first retail energy providers, which are known as "REPs," engaged IC Solutions to create a software solution to manage its electronic data interchange, or EDI, in order to participate in the retail electricity market. Other REPs also approached IC Solutions for a similar service.[6]

EDI is the data interchange system that REPs use to schedule and deliver electricity.[7] REPs operate in states that have deregulated retail electricity that permit competition with the incumbent utility. REPs arbitrage what they term "headroom": the difference in price between the electricity that they can buy at wholesale prices through short-term contracts and the electricity bought by incumbent utilities through long-term

---

[3] Pre-Trial Stip. and Order ("Pre-Trial Stip.") ¶ II.A.2.

[4] Tr. 668-69 (Nate).

[5] *Id.* 622, 625-26 (Bryn), 669 (Nate).

[6] *Id.* 668-69 (Nate), 601 (Bryn).

[7] JX 336 (Weigand Report) at 8-9.

contracts.[8] Historically, the price of natural gas, a primary source to generate electricity, has been highly volatile, which creates opportunities for headroom.[9] For example, when natural gas prices drop, REPs can buy electricity at lower wholesale prices than incumbent utilities that are locked into long-term contracts and thereby sell electricity at lower retail prices than incumbent utilities.[10]

Lynn Cannon was introduced to Nate through his wife, Leslie Cannon, who had been doing marketing and business planning work for Nate to explore business opportunities for IC Solutions.[11] Nate and Lynn Cannon began discussing working together to create EDI solutions for the then-nascent retail electricity industry.[12]

Nate, Cannon, and Bryn agreed to work together at what became ESG. Each would receive stock in exchange for their contributions to the Company. In general terms, Cannon would invest capital; Bryn would work in client services; and Nate would lead the company.[13] They also decided to hire Gurule, a software developer at IC Solutions.[14]

---

[8] Tr. 1035-39 (Weigand).

[9] *Id.* 1082 (Weigand).

[10] JX 332 (Jacobs Report) at ¶ 100.

[11] Tr. 669 (Nate).

[12] *Id.* 17-18 (Cannon), 601 (Bryn), 669 (Nate).

[13] *Id.* 670 (Nate), 39, 132 (Cannon).

[14] *Id.* 23 (Cannon), 325-26 (Gurule), 670-71 (Nate).

On September 20, 2000, Nate, Cannon, Bryn, and Gurule entered into a Stockholders' Agreement, which specified their stock ownership of ESG as follows:[15]

| Stockholder | Number of Shares | Percentage Ownership |
|---|---|---|
| Nate | 1,320,000 | 35.20% |
| Cannon | 1,218,750 | 32.50% |
| Bryn | 1,098,750 | 29.30% |
| Gurule | 112,500 | 3% |

As required by Section 9 of the Stockholders' Agreement, ESG made the appropriate elections to be taxed as a Subchapter S corporation.[16] Thus, ESG does not pay federal tax on its income. Rather, the stockholders of ESG pay federal income tax on their respective shares of the Company's profits.

### C. ESG's Lines of Business and Growth

Before the Merger, ESG offered three services: (i) Transaction Management Services (TMS), which is an EDI solution; (ii) Prospect-to-Cash (P2C), which is largely a billing management service; and (iii) Wholesale Energy Services (WES), which is a data management and reporting service. TMS has accounted for the majority of the Company's revenue, as demonstrated by ESG's revenues in 2012, the last full year before the Merger: approximately $18.8 million from TMS, approximately $10.8 million from P2C, and approximately $1.8 million from WES.[17] Given its recurring revenue business model, an average contract length of around three years, and high customer retention

---

[15] JX 2 (Stockholders' Agreement) at NO00000291.

[16] *Id.* at § 9.

[17] JX 288 (Energy Services Group, Inc., Profit & Loss: January through December 2012).

rates,[18] ESG's revenues have generally been "predictable," as Cannon acknowledged at trial.[19]

Much of the Company's success can be traced to several apparent advantages it holds over its competitors. As touted on the Company's website, ESG's three products offer an "end-to-end business process solution" for REPs,[20] which can reduce their costs and the risk of data translation errors.[21] Cannon and ESG's senior management testified uniformly that they believe ESG's products and services are higher quality than those of its competitors.[22]

Consistent with its strong position in the market, the Company experienced significant revenue and cash flow growth in the years leading up to the Merger despite facing competition since its founding.[23] In the five-year period before the Merger, ESG's

---

[18] JX 225 (Energy Services Group, Inc., Sales and Marketing Overview, Jan. 2013) at ESG00036442.

[19] Tr. 159-60 (Cannon). Most TMS customers are billed monthly on a per-meter basis. P2C customers are billed monthly on a per-account basis. WES customers are billed monthly on a megawatt-hour or per-account basis. Pre-Trial Stip. ¶¶ II.C.9-11. ESG's contracts generally have tiered pricing, meaning that larger customers are charged less on a per-meter, per-account, or megawatt-hour basis. Tr. 1258 (Jacobs).

[20] JX 330 (Technology, Energy Services Group, http://www.energyservicesgroup.net/ technology (last visited July 25, 2014)) at JACOBS0005434.

[21] Tr. 571 (Fenton), 314-15 (Purdum).

[22] *Id.* 136-38 (Cannon), 306, 314-15 (Purdum), 419-23 (Potter), 570-74 (Fenton).

[23] *Id.* 678 (Nate).

revenues and earnings before interest and taxes (EBIT) demonstrated strong growth, which ESG's financial expert, E. Allen Jacobs, calculated as follows (in millions):[24]

|         | 2008   | 2009   | 2010   | 2011   | 2012   |
|---------|--------|--------|--------|--------|--------|
| Revenue | $14.9  | $15.2  | $20.7  | $27.4  | $32.2  |
| EBIT    | $5.6   | $5.7   | $9.7   | $14.3  | $17.3  |

According to Nate's expert, Yvette Austin Smith, over the seven years from 2005 to 2012, ESG's revenue grew at a compound annual rate of 23.4%.[25]

ESG made pro-rata distributions of a majority, but not all, of its income to its stockholders. Historically, Nate, Bryn, Cannon, and Gurule received a combination of (i) below-market salaries (*i.e.*, $80,000 per year for Nate, Bryn and Cannon and more for Gurule); (ii) monthly "draws" that were in effect interest-free loans against their distributions; and (iii) distributions, a portion of which covered the stockholders' tax liabilities for their pro rata shares of the Company's profits.[26] Because the amounts paid to Nate, Bryn, Cannon, and Gurule as salary were below-market, the distributions they received did not accurately reflect the return on their equity investments in the Company. To accurately reflect their equity returns, the distributions must be "normalized" to account for the difference between market-rate salaries and the salary payments they

---

[24] JX 332 (Jacobs Report) at ¶ 35; *see also* JX 331 (Austin-Smith Report) at ¶ 13 (reflecting similar calculations for ESG's historical revenues).

[25] JX 331 (Austin Smith Report) at ¶ 13.

[26] JX 332 (Jacobs Report) at ¶¶ 18-21.

actually received.[27]  Table 1 below reflects the normalized distributions from ESG to Nate, Bryn, Cannon, and Gurule for the years 2009-2012 as calculated by Jacobs, Defendants' expert.

| Table 1 ESG Normalized Distributions[28] | | | | | |
|---|---|---|---|---|---|
|  | **Nate** | **Bryn** | **Cannon** | **Gurule** | **Total** |
| 2007 | $1,148,389 | $966,212 | $1,115,315 | $0 | $3,229,916 |
| 2008 | $1,864,181 | $1,537,720 | $1,794,635 | $0 | $5,196,535 |
| 2009 | $1,937,022 | $1,606,018 | $1,799,602 | $2,334 | $5,344,976 |
| 2010 | $1,740,546 | $1,487,198 | $1,596,909 | $677 | $4,825,330 |
| 2011 | $3,385,556 | $3,004,595 | $3,503,761 | $237,228 | $10,131,140 |
| 2012 | $4,226,053 | $4,008,597 | $4,437,621 | $277,020 | $12,949,291 |
| Total | $14,301,747 | $12,610,340 | $14,247,842 | $517,259 | $41,677,188 |

Using the normalized distributions in Table 1, Jacobs calculated the median percentage of pre-tax income that ESG distributed for the years 2007-2012 as 76.7%.[29] The Company retained most of its undistributed income as cash on its balance sheet.  At the time of the Merger, ESG had $17.4 million in cash and equivalents on its balance sheet.[30]

---

[27] As discussed below, a DCF analysis is the sole valuation method the parties advanced here and that I use to value Nate's interest in ESG.  To determine ESG's value through a DCF, the distributions to be paid to the Company's stockholders in the future must be estimated taking into account market-rate salaries for employees.

[28] *Id.*

[29] JX 339 (Jacobs Rebuttal Report) at ¶ 70.

[30] Tr. 1330 (Jacobs); JX 332 (Jacobs Report) ¶ 195.  As of trial in this action in November 2014, ESG had approximately $19 million in cash and equivalents on its balance sheet.  Tr. 140 (Cannon).

### D. Nate's Removal as President of ESG

During the late 2000s, a significant disagreement arose among Nate, Cannon, and Bryn concerning what to do with the Company's growing pile of cash. Nate wanted to reinvest in the business. Cannon and Bryn were more interested in "being paid" through profit distributions.[31] There also was day-to-day friction in managing the Company. In July 2009, for example, Cannon postponed a new WES project after repeated operational delays.[32] Nate responded by directing ESG's controller to not "pay any bonuses without my explicit approval."[33] A colorful email exchange ensued, with Nate and Cannon each stating that the other would have been fired if he was not a stockholder of ESG.[34]

Nate, Cannon, and Bryn sought to work out their differences. On August 11, 2009, they engaged in mediation conducted by Bryn's father-in-law.[35] They left the one-day mediation with "assignments" to work on in anticipation of a second meeting.[36]

Rather than continue with the mediation, Cannon decided that it was time to end Nate's employment relationship with ESG. On August 11, the same day of the mediation, Cannon drafted a notice for a special meeting of the ESG board of directors to

---

[31] Tr. 688 (Nate).

[32] *Id.* 45-46 (Cannon); JX 42 (Email from Keith Ruhl to Bob Potter (July 10, 2009)) at ESG00032962.

[33] JX 42 (Email from Nate Owen to Lisa Swift (July 13, 2009)) at ESG00032961.

[34] *Id.* (Email from Nate Owen to Lynn Cannon (July 13, 2009)) at ESG00032960; *Id.* (Email from Lynn Cannon to Nate Owen (July 13, 2009)) at ESG00032960.

[35] Tr. 150 (Cannon).

[36] *Id.* 690-91 (Nate).

remove Nate as President. Cannon understood that he could not eliminate Nate's ownership interest "without going through some type of negotiated purchase," but that, with Bryn's cooperation, there would be sufficient votes on the three-person board to end Nate's day-to-day relationship with the Company.[37]

On Thursday, August 13, 2009 at 1:49 p.m., Cannon and Bryn sent Nate a notice of a special board meeting to occur on Friday, August 14 at 11:00 a.m., in Boston.[38] This was the first formal board meeting in the history of the Company.[39] The notice identified the purpose of the meeting as "considering, and upon such a determination by the Board of Directors, approving the immediate termination [of] the employment of Nate Owen as President of the [Company], and the election of Lynn Cannon as President pro tem." Further, the board would "consider the employment of Nate Owen as Vice President, Special Projects, pursuant to terms and conditions attached" to the notice.[40] Those terms and conditions contemplated a six-month leave of absence and a demotion for Nate, who would report to Cannon if he returned after six months.[41] Cannon knew that Nate would find this condition unacceptable.[42]

---

[37] *Id.* 150, 155 (Cannon).

[38] JX 53 (Email from Lynn Cannon to Nate Owen (Aug. 13, 2009)) at ESG00020434.

[39] Tr. 153 (Cannon).

[40] JX 53 (Notice of Special Meeting of the Board of Directors) at ESG00020436.

[41] *Id.* at ESG00020435.

[42] Tr. 153 (Cannon), 695-96, 700 (Nate).

Nate, who was in Pennsylvania attending to a medical issue for his wife, was "shocked" by the proposal and felt "incredibly betrayed" by his brother.[43] He called the lawyer whose name appeared in the special meeting notice (Barry C. Klickstein, Esquire at Duane Morris LLP)[44] and asked for a delay of the meeting to make it easier for him to travel to Boston and attend the meeting in person. Cannon and Bryn refused.[45]

After making arrangements for his family, Nate traveled overnight to attend the meeting. Once there, he was not allowed to say anything. Cannon and Bryn promptly voted, over Nate's objection, to remove him as President. After the meeting, Nate's keycard access was deactivated, his email access was terminated, and all of his work and personal emails were deleted from the system. That same day, $35,000 was removed from his personal bank account, likely because Cannon and/or Bryn cancelled a recent direct deposit from the Company.[46]

After the six-month leave of absence, Nate did not return to ESG, nor did he contact Cannon or Bryn about returning to work.[47] Under the terms imposed by Cannon, Nate continued to receive a base salary and benefits as well as stockholder distributions.[48]

---

[43] *Id.* 693-94 (Nate).

[44] Cannon and Bryn retained Klickstein to represent ESG. *Id.* 53 (Cannon). Nate had never heard of him before receiving the special meeting notice. *Id.* 694 (Nate).

[45] *Id.* 151 (Cannon), 694-95 (Nate).

[46] *Id.* 696-700 (Nate).

[47] *Id.* 723-24 (Nate).

[48] *Id.* 49-50, 154 (Cannon), 719-20 (Nate); JX 53 at ESG0020435.

12

According to Nate, the Company became "extremely obstinate" in providing Nate access to information about ESG once he was terminated.[49] In October 2009, Nate made a formal demand under 8 *Del. C.* § 220 to obtain books and records from the Company.[50] ESG thereafter provided certain financial information, including its 1999-2008 tax returns, its 2007-2008 audited financial statements, and a copy of its QuickBooks files.[51]

### E.    Cannon Prepares Multi-Year Projections and Offers to Buy Out Nate

Before 2010, ESG had not prepared multi-year projections for the Company or its individual lines of business.[52] Instead, at the beginning of each calendar year, Cannon would prepare an annual budget. ESG management participated in Cannon's budgeting process "in terms of providing the inputs for what [the Company] can expect for the upcoming year."[53] Bryn also typically reviewed the budget with Cannon.[54]

Cannon's understanding of ESG's future prospects stems in large part from weekly, two-hour meetings held on Monday mornings, during which he and the department heads discuss sale opportunities and operations.[55] Drew Fenton, Vice President of Business Development at ESG, described the two-hour meetings as

[49] Tr. 701-03 (Nate).

[50] JX 378 (Letter from Joseph Demeo to Barry Klickstein (Oct. 21, 2009)).

[51] Pre-Trial Stip. ¶¶ II.D.15-16.

[52] Tr. 300 (Purdum), 350 (Gurule), 405 (Potter).

[53] *Id.* 34-35 (Cannon).

[54] *Id.* 629-31 (Bryn).

[55] *Id.* 33-34, 160-61 (Cannon).

"exhausting."[56] Once a month, ESG management also compares realized revenue to the annual budget.[57] Based on these meetings with management, Cannon admitted that he knows what the department heads know, meaning that he is "very familiar" with the Company's business and has a "good handle" on specific customer relationships.[58]

In February 2010, Cannon extrapolated the Company's 2010 annual budget into a set of multi-year projections for years 2010-2015 to see what ESG's future performance might "look like from a P&L perspective."[59] I refer to these projections as the "2010 Projections."[60] To create the 2010 Projections, Cannon took the Company's 2010 annual budget and then applied an assumed growth rate to each line of the budget for each year. Some line items had higher growth rates in later years, and others had lower growth rates. Cannon projected revenue growing from approximately $15.27 million in 2009 to $39.5 million in 2015.[61]

Cannon claims he created the 2010 Projections, and every future set of multi-year projections for ESG, without seeking input from anyone else at the Company. Although ESG's employees confirmed that Cannon did not seek their input into the preparation of

---

[56] *Id.* 583 (Fenton).

[57] *Id.* 305 (Purdum), 357 (Gurule).

[58] *Id.* 179, 160-61 (Cannon).

[59] *Id.* 56 (Cannon).

[60] JX 89 (2010 Projections).

[61] *Id.* at 1.

14

projections per se,[62] the weight of the evidence reflects that, even if Cannon did not explicitly ask for their input, he obtained functionally equivalent knowledge based on the extensive discussions of ESG's future prospects he had with members of management on a regular basis.[63] Indeed, Cannon's familiarity with the Company's business prospects grew over time after he had arranged to remove Nate from management and assumed firm control over the day-to-day operations of ESG.

According to Nate, Cannon and Bryn (through ESG) offered to repurchase his stock for $8 million in 2010. Nate rejected this offer, which Cannon denied making,[64] as "ridiculously low."[65] Although no documentary evidence supports the existence of this offer, I find Nate's testimony to be credible on this point.[66] The making of such an offer also is consistent with the fact that Cannon contemporaneously created a set of multi-year projections for the first time in the Company's history in 2010; and that the parties had retained, at ESG's expense, valuation experts during this period.[67]

---

[62] Tr. 300-01 (Purdum), 350 (Gurule), 405 (Potter).

[63] *Id.* 160-61 (Cannon), 305 (Purdum), 356-57 (Gurule), 583 (Fenton).

[64] *Id.* 192 (Cannon).

[65] *Id.* 704-05 (Nate).

[66] *See Cruz v. State*, 12 A.3d 1132, 1136 (Del. 2011) ("The fact finder 'is free to accept or reject in whole or in part testimony offered before it, and to fix its verdict upon the testimony it accepts.' ").

[67] JX 91 (Email from Barry Klickstein to Chris Waterman (Feb. 3, 2010)) at NO00000879-80.

15

In 2011, Cannon engaged Duff & Phelps to provide a valuation of the Company for the purpose of repurchasing Nate's shares.[68] Duff & Phelps performed a discounted cash flow analysis based on projections extrapolated from Cannon's 2011 annual budget, as well as an analysis of five, comparable publicly traded companies.[69] On May 12, 2011, Duff & Phelps provided a midpoint valuation of ESG (including cash and equivalents) of approximately $64.8 million, or approximately $17 per share.[70] At that price, Nate's 1,320,000 shares would have been worth $22.44 million.[71]

According to Nate, ESG made a second offer to repurchase his shares in mid-2011, this time for $12 million. He rejected the offer as "entirely insufficient."[72] No documents in the record reflect such an offer and Cannon again disclaimed ever making such an offer, but I find Nate's testimony more credible.[73]

---

[68] Tr. 161-62 (Cannon).

[69] JX 122 (Energy Services Group, Inc., Equity Valuation as of Apr. 30, 2011) at D&P_ESG001110-13.

[70] JX 122 (Email from Jeff Davis to Lynn Cannon (Mar. 12, 2011)) at D&P_ESG001088; Duff & Phelps's valuation produced a range of $61.7 million to $67.9 million, with a midpoint of $64.8 million. *Id.* (Energy Services Group, Inc., Equity Valuation as of Apr. 30, 2011) at D&P_ESG001097.

[71] Pre-Trial Stip. ¶ II.D.19.

[72] Tr. 706 (Nate).

[73] *Id.* 192 (Cannon).

In early 2012, Cannon prepared a revised version of the 2010 Projections, which I refer to as the "2012 Projections."[74]  The 2012 Projections use the same growth assumptions as the 2010 Projections but project higher future revenues.  This is because the 2012 Projections were derived from the Company's actual results for 2010, which were higher than the 2010 annual budget used to create the 2010 Projections.[75]  For example, projected revenue of $39.5 million for the year 2015 in the 2010 Projections increased to projected revenue of $44.34 million in the 2012 Projections.[76]

In an April 2012 planning conference, Cannon presented the 2012 Projections to senior management as a "bogie" for ESG's potential future performance.[77]  The presentation described the projections for the years 2013-2015 as "Revenue Targets."[78] The same presentation noted that while falling natural gas prices were good for ESG customers, there was a market expectation that natural gas prices would level off eventually.[79]

---

[74] JX 167 (2012 Projections); JX 149 (Email from Lynn Cannon to Mark Drew (Mar. 13, 2012)) at ESG00056706.

[75] Tr. 73-74 (Cannon).

[76] *Compare* JX 167 (2012 Projections), *with* JX 89 (2010 Projections).

[77] Cannon Dep. 48-49; Tr. 173 (Cannon).

[78] JX 157 (Executive Conference, Agenda and Presentation Materials (Apr. 26-27, 2012)) at ESG00059235.

[79] *Id.* at ESG00059254.

### F. ESG Engages Grant Thornton to Perform a Series of Valuations

In June 2012, Cannon engaged Grant Thornton to assist ESG in obtaining financing to buy back Nate's shares.[80] Cannon directed the Company's controller, Lisa Swift, to send the 2012 Projections to Grant Thornton.[81] When ESG shared the 2012 Projections with Grant Thornton in June 2012, it had exceeded the monthly projections in them.[82]

ESG's main contact at Grant Thornton was Len Batsevitsky, although a colleague, Peter Resnick, would perform the indication of value of the Company in connection with the Merger.[83] In June 2012, Grant Thornton used the 2012 Projections to analyze a proposed financing structure from Wells Fargo.[84]

In early July 2012, Cannon spoke with Batsevitsky about making certain adjustments to the 2012 Projections, including decreasing revenue growth and increasing operating costs.[85] In an email, Cannon stated that these revisions were necessary due to "future competitive forces in the market." Batsevitsky responded that the revisions

---

[80] Pre-Trial Stip. ¶ II.D.21; Tr. 173-74 (Cannon).

[81] JX 166 (Email from Lisa Swift to Len Batsevitsky (June 20, 2012)).

[82] Tr. 174 (Cannon).

[83] Resnick was deposed as a Court of Chancery Rule 30(b)(6) witness of Grant Thornton, but he was tendered at trial in his personal capacity. Tr. 501. Batsevitsky, who was no longer with Grant Thornton at the time of trial, was not deposed and did not testify at trial. *Id.* 112-13.

[84] JX 167 (Email from Len Batsevitsky to Lisa Swift (June 27, 2012)) at ESG00093694.

[85] Tr. 176-77 (Cannon).

would "make the projections more conservative which may be better as Wells [Fargo] will most[] likely use them to set covenant levels."[86] All else being equal, the changes Cannon proposed would make ESG less valuable.[87]

Cannon testified that, at this time, Batsevitsky "had taken over custody of the financial modeling," implying that the assumptions in the revised projections were those of Grant Thornton's creation.[88] I do not accept Cannon's attempt to distance himself from the revisions to the 2012 Projections. Based on the documentary evidence and the testimony of Resnick, who was a credible third-party witness, I find that Cannon caused Grant Thornton to revise the 2012 Projections into a new set of multi-year projections for the years 2012-2017,[89] which I refer to as the "Revised 2012 Projections."[90] The changes Cannon requested with respect to the overlapping years in the 2012 Projections and the Revised 2012 Projections were relatively modest. For example, projected revenue for 2015 decreased from $44.34 million to $43.93 million.[91]

The Revised 2012 Projections were created by taking the base year of 2012 (which was a combination of actual results plus projected results drawn from the 2012 annual

---

[86] JX 171 (Email from Len Batsevitsky to Lynn Cannon (July 17, 2012)).

[87] Tr. 498-99 (Resnick).

[88] *Id.* 91 (Cannon).

[89] JX 171 (Email from Len Batsevitsky to Lynn Cannon (July 17, 2012)); Tr. 495-96 (Resnick).

[90] JX 192 (Revised 2012 Projections).

[91] *Compare id.*, *with* JX 167 (2012 Projections).

budget) and then applying an assumed growth rate. The Revised 2012 Projections include quarterly line item projections for the years 2012-2015 and annual bottom line revenue growth assumptions for the years 2016-2017.[92] Projected year-over-year revenue growth was 20.2% in 2012; 11.9% in 2013; 10.0% in 2014; and 8.5% in 2015-2017, with projected revenue for 2017 of $51.73 million. The projected EBIT margin was 57.4% in 2012; 56.5% in 2013-2015; and 56.6% in 2016-2017, with projected EBIT for 2017 of $29.28 million.[93]

In July 2012, at the same time Cannon was discussing these assumptions with Grant Thornton, ESG employees were voicing their concerns with Cannon "about possible attrition" in their customer base, including the threat of losing customers to a key competitor, EC Infosystems.[94] Thus, the record shows that Cannon was well aware of pricing pressures and "future competitive forces in the market" when he was discussing ESG's prospects with Batsevitsky.[95]

---

[92] Typically, the assumed growth rates were constant for each year. For example, ESG's largest income line item, Transaction Processing Fees, was assumed to grow 1.19% on a quarterly basis (4.8% annually) during 2013-2015, and ESG's second largest income line item, Billing Services, was assumed to grow 5.0% on a quarterly basis (20% annually) during 2013, 3.75% on a quarterly basis (15% annually) in 2014, and 2.5% on a quarterly basis (10% annually) in 2015. JX 192 (Revised 2012 Projections).

[93] *Id.*

[94] JX 170 (Email from Carol Purdum to Lynn Cannon (July 5, 2012)) at ESG00100820; *Id.* (Email from Lynn Cannon to Carol Purdum (July 3, 2012)) at ESG00100823.

[95] JX 171 (Email from Len Batsevitsky to Lynn Cannon (July 17, 2012)); Tr. 83 (Cannon).

Cannon authorized Grant Thornton to provide the Revised 2012 Projections to several financing sources for a prospective buyout of Nate's interest in the Company, including Citizens Bank, UBS, and Wells Fargo.[96] Cannon admitted he would not have authorized Grant Thornton to share the Revised 2012 Projections with these potential lenders if he thought they were unrealistic.[97]

In September 2012, ESG's counsel proposed to Nate's counsel that the parties engage in mediation to facilitate a purchase of Nate's shares in the Company.[98] On September 12, 2012, ESG's counsel formally engaged Grant Thornton to perform a valuation of the Company.[99] Given the sequencing of events, I find that Cannon and Bryn sought an updated valuation of the Company based on the Revised 2012 Projections for purposes of the mediation.[100]

In October 2012, Grant Thornton performed a discounted cash flow analysis of ESG based on the Revised 2012 Projections. Assuming a discount rate of 15.1%, a tax rate of 40%, and a perpetuity growth rate of 2.5%, and excluding the cash on the Company's balance sheet, Grant Thornton came to an enterprise value for ESG of approximately $118.5 million. Further assuming that Nate owned 33.3% of ESG on a

---

[96] Tr. 172 (Cannon); JX 187 (Email from Lynn Cannon to Francois Karl-Henry (Sept. 28, 2012)).

[97] Tr. 189 (Cannon).

[98] Pre-Trial Stip. ¶ II.D.24; Tr. 707 (Nate).

[99] JX 180 (Engagement Letter from Grant Thornton to Barry Klickstein (Sept. 12, 2012)).

[100] Tr. 190 (Cannon).

fully diluted basis, Grant Thornton indicated that the enterprise value of Nate's interest was approximately $39.5 million on a going-concern basis, excluding his pro rata share of any cash on hand.[101]

Before the mediation, Nate sought and obtained certain information from the Company. In October 2012, Nate received ESG's 2011 audited financial statements.[102] In November 2012, Nate's financial advisor, Floyd Advisory, obtained access to the financial information contained in the Company's QuickBooks file.[103] Nate also received certain personal tax information from Cannon and Bryn, and representatives of Floyd Advisory met with Cannon and ESG senior management.[104]

In November 2012, the parties engaged in mediation. It was unsuccessful. Cannon and Bryn offered to buy out Nate for $18 million.[105] This offer was based on the "May 2011 valuation report prepared by Duff & Phelps."[106] In other words, the offer was not based on the more recent Grant Thornton discounted cash flow analysis of the

---

[101] JX 192 (Revised 2012 Projections); Tr. 519-21 (Resnick). Grant Thornton further assumed a 20% discount for lack of marketability and a 20% discount for a non-controlling interest, which reduced the enterprise value of Nate's interest to approximately $25.3 million, excluding his pro rata share of the Company's cash. JX 192 (Revised 2012 Projections).

[102] JX 191 (Email from Barry Klickstein to Wayne Dennison (Oct. 3, 2012)) at NO00000165.

[103] JX 199 (Email from Michael Abasciano to Len Batsevitsky (Nov. 7, 2012)).

[104] Tr. 96-98 (Cannon).

[105] *Id.* 190 (Cannon).

[106] JX 226 (Letter from Wayne Dennison to Barry Klickstein (Jan. 16, 2013)) at ESG00101316.

Revised 2012 Projections. Nate rejected the $18 million offer as too low. He thought that ESG was "exploding in growth."[107] On January 16, 2013, Nate countered with a proposal that did not involve selling his shares but would have led to his resigning from the board of ESG.[108] Cannon and Bryn rejected this proposal, which ESG's lawyer, Klickstein, characterized as "absurd."[109]

### G. ESG's Business Shortly before the Merger

By December 2012, ESG learned that Viridian, the Company's largest customer, expected to end its relationship with ESG in early 2013.[110] Viridian accounted for approximately $2.5 million, or 7.9%, of ESG's 2012 revenue.[111] Bob Potter, ESG's Vice President of Sales and Marketing, tried to retain Viridian by offering lower prices and emphasizing ESG's greater functionality and value, but he was unsuccessful.[112]

By April 2013, Viridian had left ESG to become a customer of EC Infosystems, one of ESG's main competitors.[113] EC Infosystems had been a consistent competitor of

---

[107] Tr. 708 (Nate).

[108] JX 226 (Letter from Wayne Dennison to Barry Klickstein (Jan. 16, 2013)) at ESG00101318.

[109] Tr. 100-01 (Cannon); JX 230 (Letter from Barry Klickstein to Wayne Dennison (Jan. 31, 2013)) at ESG00089398.

[110] JX 215 (Email from Florie Ritchie to Bob Potter (Dec. 28, 2012)) at ESG00041703.

[111] Tr. 110 (Cannon); JX 332 (Jacobs Report) at ¶ 68.

[112] JX 209 (Email form Bob Potter to Michael Fallquist (Dec. 5, 2012)) at ESG00071791-93; Tr. 383-85 (Potter).

[113] Tr. 258-59 (Purdum), 383-85 (Potter).

ESG's, likely for over a decade.[114] Potter testified that the Company's competitors were "commoditizing" its products.[115] In a July 2012 email chain and at other times, ESG employees were complaining to Cannon that EC Infosystems was stealing their business by offering lower prices, even though they believed that ESG offered "superior client support."[116] Into early 2013, ESG employees were still "worried about the bleeding" of losing their customers.[117]

In addition to facing competition from other service providers, ESG's business faced the risk of losing customers that might choose to in-source some or all of the services ESG provided. As competition in the retail energy market matures and consolidates, REPs can be forced to cut costs, particularly for the type of back-office functions that ESG offers.[118] For example, in mid-2012, ESG lost two of its top five P2C customers, NAPG and AEP, to in-sourcing.[119] AEP in-sourced the TMS services it received from ESG as well.[120] ESG also lost several WES customers that year for a

---

[114] *Id.* 566 (Fenton).

[115] *Id.* 378-79 (Potter).

[116] JX 170 (Email from Carol Purdum to Lynn Cannon (July 5, 2012)) at ESG00100820.

[117] *See, e.g.*, JX 236 (Email from Carol Purdum to Bob Potter (Feb. 26, 2013)) at ESG00085988.

[118] Tr. 1040-41 (Weigand).

[119] JX 170 (Email from Carol Purdum to Lynn Cannon (July 5, 2012)) at ESG00100820-21.

[120] Tr. 267 (Purdum).

24

similar reason,[121] although the WES losses represented only a fraction of ESG's revenue.[122] These and related competitive threats often forced ESG to renegotiate expiring contracts with customers at lower prices. In 2012 and 2013, ESG renegotiated certain contracts for prices that would yield 30% or lower revenue.[123]

ESG employees were disappointed by the loss of Viridian, but Cannon viewed this as a "one-time event" and not as a "defect in the business model."[124] Consistent with this testimony, in a January 2013 sales and marketing overview presentation, ESG touted a "[v]ery full sales pipeline" and an expectation that the Company "[w]ill close 6 to 10 deals in 2013."[125]

---

[121] *Id.* 334-35 (Gurule).

[122] For example, in their brief, Defendants cite the loss of TruPro as a WES customer. Defs.' Ans. Br. 18. But TruPro generated no revenue in 2011 and only $12,285 in revenue in 2012, which was less than 0.0005% of the Company's revenue that year. JX 319 (Excel File – ESG Monthly Sales by Client – Fiscal Years 2000-2014).

[123] JX 354 (Excel File – Reduced Fee Impact Summary). On the other side of the equation, there is the possibility of new retail energy markets for REPs. A news report published shortly after the Merger discussed recent developments in Michigan and Indiana to consider expanding consumer utility choice. JX 315 (Bill Malcolm, *Michigan, Indiana Warm to the Idea of Expanding Consumer Utility Choice*, Midwest Energy News (May 14, 2013), http://www.midwestenergynews.com/2013/05/14/michigan-indiana-warm-to-the-idea-of-expanding-consumer-utility-choice/).

[124] Tr. 211 (Cannon).

[125] JX 225 (Energy Services Group, Inc., Sales and Marketing Overview, Jan. 2013) at ESG00036453.

## H.    Cannon Decides to Cash Out Nate

In January 2013, Cannon decided that it was time to eliminate Nate's ownership interest in the Company.[126]  According to Cannon, "the relationship had to come to a head" after the latest failed mediation, and he and Bryn "chose to do a cash-out merger because it was clear that [he, Bryn, and Nate] couldn't come to a resolution any other way."[127]

In March 2013, Cannon updated the Company's valuation materials.  He revised his 2013 annual budget to reflect the loss of Viridian, and made line-by-line changes to accurately reflect the developments he saw in the Company's business.[128]  Although Cannon testified that, in revising the 2013 annual budget, he did not undertake a "deep dive" of the Company's or the industry's future prospects beyond 2013,[129] the record shows that he was well versed in the Company's future prospects from, among other things, the comprehensive weekly and other meetings he held with members of the Company's senior management.

On March 13, 2013, Cannon sought to schedule a meeting the following day with Grant Thornton's Batsevitsky to review the Company's projections.  Cannon explained to Batsevitsky, who Cannon knew was on "personal time" that day, that "[t]iming has

---

[126] Tr. 101, 193 (Cannon).

[127] *Id.* 206-07 (Cannon).

[128] *Id.* 193-94 (Cannon).

[129] *Id.* 116-17, 213, 230 (Cannon).

become a significant issue."[130] When I asked Cannon at trial to explain why he thought it was necessary to buy out Nate in the March-April 2013 time frame, he was unable to offer any credible business explanation for why timing had become such an "issue."[131] I credit Cannon's deposition testimony and find that he and Bryn wanted to effectuate a cash-out transaction quickly in order "to stop the hemorrhage" of paying profit distributions to Nate.[132] As noted in Table 1 above, Nate had received over $14 million in distributions during 2007-2012, with the majority of those distributions being made after Nate was removed as President in August 2009.

In March 2013, Cannon directed ESG's controller to provide the Company's 2013 annual budget to Grant Thornton.[133] As occurred in 2012 with respect to the Revised 2012 Projections, Grant Thornton and Cannon discussed the appropriate growth rate assumptions to apply with respect to the 2013 annual budget.[134] At Cannon's direction, Grant Thornton applied the assumptions they discussed to the 2013 annual budget to produce a set of projections for the years 2013-2017, dated as of March 15, 2013.[135]

---

[130] JX 242 (Email from Lynn Cannon to Len Batsevitsky (Mar. 13, 2013)).

[131] Tr. 232-33 (Cannon).

[132] *Id.* 208-09 (Cannon); Cannon Dep. 190.

[133] JX 249 (Email from Lynn Cannon to Len Batsevitsky (Mar. 15, 2013)).

[134] Tr. 194 (Cannon).

[135] JX 250 (Email from Len Batsevitsky to Lynn Cannon (Mar. 15, 2013)); Tr. 229 (Cannon).

Resnick testified that these projections came from ESG management,[136] and internal Grant Thornton documents characterized them as "management's financial forecast."[137]

Grant Thornton did not come up with any of its own financial forecast assumptions.[138] Rather, as Resnick testified, which I find to be a credible account, ESG provided the underlying assumptions, and Grant Thornton tested the reasonableness of those assumptions in the March 15 projections through conversations with Cannon, including discussions about the Company's position in the industry, pricing pressure from competitors, and industry trends.[139] To note one example, I find that it is more likely than not that Cannon told Batsevitsky to decrease the 8.5% revenue growth assumption for years 2016-2017 in the Revised 2012 Projections to the 6.0% revenue growth assumptions for years 2016-2017 in the March 15 projections.[140]

In delivering the March 15 projections, Batsevitsky noted that he and Cannon should discuss further the 6.0% revenue growth assumptions for the years 2016-2017.[141] Cannon testified that he thought those assumptions were "overly optimistic given the

[136] Tr. 513 (Resnick).

[137] JX 255 (Email from Len Batsevitsky to Oksana Westerbeke (Mar. 19, 2013)) at GT017922.

[138] Tr. 493 (Resnick).

[139] *Id.* 484, 486-87, 490-91 (Resnick). Although Resnick did not have personal knowledge of some of these events, he was Grant Thornton's partner on the ESG account and his explanation of events was logical and consistent with the documentary record.

[140] *Id.* 508-10 (Resnick), 116 (Cannon).

[141] JX 250 (Email from Len Batsevitsky to Lynn Cannon (Mar. 15, 2013)) at ESG00095769.

28

headwinds that [the Company was] seeing."[142]  Although Cannon did not specifically

solicit input from ESG management for this purpose, he likely discussed the growth

assumptions at some point in time with Bryn, who also testified that he thought the

assumptions "were quite optimistic."[143]

Based on Batsevitsky's conversations with Cannon, and, to a lesser extent, with

ESG's controller,[144] Grant Thornton produced another set of projections for the years

2013-2017 dated March 28, 2013, which I refer to as the "2013 Projections."[145]  There

are certain differences between the March 15 projections and the 2013 Projections.  For

example, projected revenue growth of 7.4% for 2014 and 6.1% for 2015 in the March 15

projections were revised to 7.5% for 2014 and 5.8% for 2015 in the 2013 Projections.

However, the 6.0% projected revenue growth for 2016-2017—what Cannon claimed at

trial was "overly optimistic"—went unchanged.[146]  According to Resnick, there was no

disagreement between Grant Thornton and ESG on any of the forecast assumptions.[147]

The 2013 Projections include quarterly line item projections for the years 2013-

2015 and annual bottom line revenue growth assumptions for the years 2016-2017.

Overall, the most significant changes in the 2013 Projections from the Revised 2012

---

[142] Tr. 111-12 (Cannon).

[143] *Id.* 608 (Bryn), 113 (Cannon), 301 (Purdum), 405 (Potter).

[144] *Id.* 485, 535, 538 (Resnick).

[145] JX 264 (2013 Projections) at NO00000046-50.

[146] *Compare* JX 255 at GT017931, *with* JX 264 (2013 Projections) at NO00000052.

[147] Tr. 493, 510 (Resnick).

Projections were reducing revenue forecasts to reflect the loss of Viridian as a customer and reducing ESG's operating margin to reflect increased competition, which resulted in lower projected EBIT for 2013 and, in turn, lower projected EBIT for 2014-2017.[148] Cannon testified that he "[a]bsolutely" used the best information he had available in creating the 2013 Projections.[149] Resnick understood the 2013 Projections to reflect ESG management's best estimates of the Company's expected future performance.[150] I credit this testimony.[151]

Although the record is not entirely clear on this point, my understanding is that the parties do not dispute that the 2013 Projections reflect "normalized" salary expenses for Cannon, Bryn, and Gurule similar to those built into the model that Defendant's expert, Jacobs, created for his discounted cash flow analysis.[152] As explained above, normalization of the salary expenses for these employees is necessary to perform a discounted cash flow analysis of ESG because they historically had been compensated

[148] *Id.* 194-98 (Cannon), 502, 506 (Resnick). Around the same time, Cannon was in the process of negotiating a new commercial lease that would increase ESG's space from 16,000 to 26,000 square feet and would permit future growth. *Id.* 214 (Cannon), 303 (Purdum). Cannon and other ESG employees testified that their then-current facilities were "inadequate." *Id.* 215 (Cannon), 295-96 (Purdum), 346-48 (Gurule).

[149] *Id.* 186 (Cannon).

[150] *Id.* 492 (Resnick).

[151] ESG's performance for the rest of 2013 generally tracked the 2013 Projections. *Id.* 221-22 (Cannon).

[152] Pl.'s Op. Br. 23 (citing JX 264 (2013 Projections) at NO00000052)); Tr. of Oral Arg. 116-17.

with below-market salaries. The following tables compare certain key metrics across the 2012 Projections, the Revised 2012 Projections, and the 2013 Projections.

Table 2 below reflects ESG's projected revenue growth for the years 2012-2017.

| Table 2 ESG's Projected Revenue Growth | | | | | | |
|---|---|---|---|---|---|---|
| | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 |
| 2012 Projections | 29.8% | 15.2% | 12.6% | 10.4% | | |
| Revised 2012 Projections | 20.2% | 11.9% | 10.0% | 8.5% | 8.5% | 8.5% |
| 2013 Projections | | -4.4% | 7.5% | 5.8% | 6.0% | 6.0% |

Table 3 below reflects ESG's projected operating margin for the years 2012-2017.

| Table 3 ESG's Projected Operating Margin | | | | | | |
|---|---|---|---|---|---|---|
| | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 |
| 2012 Projections | 62.27% | 63.6% | 62.4% | 60.6% | | |
| Revised 2012 Projections | 57.4% | 56.5% | 56.5% | 56.5% | 56.6% | 56.6% |
| 2013 Projections | | 47.9% | 45.0% | 43.7% | 43.8% | 43.9% |

Table 4 below reflects ESG's projected EBIT for the years 2013-2017.

| Table 4 ESG's Projected EBIT (in thousands) | | | | | |
|---|---|---|---|---|---|
| | 2013 | 2014 | 2015 | 2016 | 2017 |
| Revised 2012 Projections | 20,797 | 22,876 | 24,822 | 26,971 | 23,284 |
| 2013 Projections | 14,702 | 14,838 | 15,248 | 16,196 | 17,195 |
| Difference | -29.3% | -35.1% | -38.6% | -40.0% | -41.3% |

Grant Thornton performed a discounted cash flow valuation of ESG based on the 2013 Projections (the "Grant Thornton Valuation").[153] Assuming a discount rate of 16.0%, a tax rate of 40%, and a perpetuity growth rate of 2.5%, and excluding the $13.6 million in cash on ESG's balance sheet, the Grant Thornton Valuation reflected an

---

[153] JX 264 (Grant Thornton Valuation) at NO00000052-58.

enterprise value for ESG of approximately $67 million. Assuming that Nate owned 33.3% of ESG on a fully diluted basis, Grant Thornton indicated that the enterprise value of Nate's interest (excluding cash) was approximately $22.331 million.[154]

On March 28, 2013, ESG provided the 2013 Projections and the Grant Thornton Valuation to Nate.[155] In the disclaimer to its valuation materials, Grant Thornton stated that the included information "does not constitute an independent valuation or fairness opinion" and that the information "includes certain statements, estimates and projections provided by the Company with respect to its anticipated future performance."[156] Also in March 2013, ESG provided its then-current financial statements and QuickBooks file to Nate's counsel.[157]

In a cover letter, ESG's counsel proposed that the Company repurchase Nate's interest in ESG for $26.331 million, which is the sum of $22.331 million (based on the Grant Thornton Valuation) plus $4 million as a proportionate distribution of ESG's cash on hand. The offer was to expire on April 5, 2013.[158] Nate did not respond to the

---

[154] *Id.* at NO00000052-53.

[155] JX 264 (Letter from Barry Klickstein to Wayne Dennison (Mar. 28, 2013)) at NO000000042.

[156] JX 264 (Grant Thornton Valuation) at NO00000045.

[157] JX 349 (Stipulation (Oct. 2, 2014)) at ¶ 14.

[158] JX 264 (Letter from Barry Klickstein to Wayne Dennison (Mar. 28, 2013)) at NO00000042; Tr. 709 (Nate).

offer.[159]  He "didn't think that anything would be gained from having the discussion" with Cannon and Bryn.[160]

On April 4, 2013, with Cannon's authorization, Batsevitsky sent the 2013 Projections to Citizens Bank for the purpose of obtaining financing to buy out Nate.[161] According to Resnick, Grant Thornton would not have sent the 2013 Projections to Citizens Bank without ESG's consent.[162]  ESG thereafter obtained a $25 million credit facility from Citizens Bank to cash out Nate's interest pending resolution of this action.[163]

## I.    The Merger

On Friday, May 3, 2013, a county sheriff served Nate at his Maine residence (when Nate was out of town) with a notice of a special meeting of the ESG board to be held on at 8:30 a.m. on Monday, May 6, 2013, to consider and vote upon a proposed merger between ESG and Acquisition Corp.[164]  This was only the second formal board

---

[159] JX 270 (Email from Barry Klickstein to Wayne Dennison (May 3, 2013)) at NO00000018.

[160] Tr. 710 (Nate).

[161] JX 265 (Email from Len Batsevitsky to Denise McGeough (Apr. 4, 2013)).

[162] Tr. 512 (Resnick).

[163] *Id.* 130-31 (Cannon), 651 (Bryn); Cannon Dep. 241-42.

[164] JX 269 (Letter from Barry Klickstein to Megan Kelley (May 3, 2013)) at ESG00089409; Pre-Trial Stip. ¶ II.D.27.  Depositions were scheduled to begin the following week in a lawsuit Nate had filed in Massachusetts Superior Court against Cannon, Bryn, and Gurule related to his removal as President of ESG. *Id.* ¶ II.D.20; Tr. 711 (Nate).  Cannon testified that the timing of the Merger had nothing to do with the scheduled depositions. *Id.* 206 (Cannon).  On September 11, 2013, the parties to the Massachusetts litigation filed a joint motion to stay the proceedings in that lawsuit

33

meeting in the Company's history.[165] The Merger Agreement, attached to the notice, contemplated that Nate would be cashed out of ESG at $19.95 per share,[166] or $26.334 million in total—$3,000 more than the Cannon and Bryn's March 2013 offer.

Also attached to the notice was the Grant Thornton Valuation based on the 2013 Projections that had been provided to Nate previously.[167] Earlier on May 3, 2013, Batsevitsky had informed ESG's counsel that Grant Thornton had "spoke[n] with ESG's Management and confirmed that as of today's date there have been no material changes to the business operations or forecast assumptions since completion of the analysis back in March."[168] In other words, when given one last chance to propose further revisions to the 2013 Projections before the Merger, Cannon reaffirmed the accuracy of the 2013 Projections. ESG also told Grant Thornton on May 3, that "the actual financial performance of the Company (from January 1, 2013 through April 30, 2013) is tracking in a manner that is materially in-line with the Company's forecast used in the analysis."[169] At trial, Cannon confirmed that both of these statements were accurate.[170]

---

pending the outcome of this action. JX 286 (Joint Mot. for Stay and to Continue Prelim. Inj. (Sept. 11, 2013)).

[165] Tr. 153 (Cannon).

[166] JX 269 (Merger Agreement) at § 7(b).

[167] JX 269 (Email from Len Batsevitsky to Barry Klickstein (May 3, 2013)) at ESG00089429; Pre-Trial Stip. ¶ II.D.28.

[168] JX 272 (Email from Len Batsevitsky to Barry Klickstein (May 3, 2013)).

[169] *Id.*

[170] Tr. 122 (Cannon).

Pressed on the subject at trial, Cannon further admitted that he stands by the 2013 Projections, testifying, "I – I signed off on the Grant Thornton projections [*i.e.*, the 2013 Projections], and I'll – I'll live with them."[171]

Nate learned about the special board meeting scheduled for May 6 when he was in New York. He immediately asked for a one-day delay so that he could travel back to Maine and study the documents served at his residence. Cannon and Bryn refused.[172] Tellingly, Cannon testified he "wasn't interested in extending [the board meeting] any further" because he believed that Nate only wanted a delay "to get to the Court to try and get an injunction."[173] In Cannon's mind, Nate, who had received the 2013 Projections back in March, "absolutely" had enough time to review the Merger materials.[174]

On May 6, 2013, the board of ESG, consisting of Nate, Bryn, and Cannon, held a special meeting to vote on the Merger. Nate recalled that this meeting was "extremely tense," in part because ESG "had hired an armed guard" who stood "at the door with a

---

[171] *Id.* 213, 172 (Cannon).

[172] *Id.* 711-12 (Nate).

[173] *Id.* 121 (Cannon). When Nate later sought injunctive relief in a Massachusetts state court, the court denied his request because the Merger already had closed. *Id.* 712 (Nate).

[174] *Id.* 121 (Cannon).

35

gun at his hip."[175]  At the meeting, Cannon and Bryn voted in favor of the Merger; Nate voted against it.[176]

In connection with the Merger, Cannon, Bryn, and Gurule transferred their ESG stock to Acquisition Corp. in exchange for Acquisition Corp. stock.  After this transfer, Nate owned 1,320,000 shares, or 35.2%, of the outstanding shares of ESG and ESG Acquisition Corp. owned 2,430,000 of the outstanding shares, or 64.8%.[177]  The Merger Agreement contemplated that ESG would merge with and into Acquisition Corp., with (i) Nate receiving $19.95 per share in cash for his ESG stock; (ii) the ESG stock held by Acquisition Corp. being cancelled for no consideration; and (iii) the stock of Acquisition Corp. remaining outstanding.  On May 6, 2013, Cannon executed a stockholder written consent as President of Acquisition Corp. in favor of the Merger.

At 9:07 a.m. on May 6, 2013, a Certificate of Merger was filed with the Delaware Secretary of State.[178]  Nate described the Merger as "boom, done, Blitzkrieg style."[179]

---

[175] *Id.* 713 (Nate).

[176] JX 278 (Resolutions of the Board of Directors of Energy Services Group, Inc. (May 6, 2013)) at NO00000250, 252; Tr. 713-14 (Nate).

[177] Pre-Trial Stip. ¶ II.D.29.  The ownership of ESG Acquisition Corp. on an undiluted basis was as follows: Cannons owned 1,218,750 shares (approximately 50.2%); Bryn owned 1,098,750 shares (approximately 45.2%); and Gurule owned 112,500 shares (approximately 4.6%).

[178] JX 280 (Certificate of Merger (May 6, 2013)).

[179] Tr. 712 (Nate).

On May 13, 2013, a notice of the Merger was sent to Nate.[180] On May 21, 2013, Nate delivered a written demand to ESG for appraisal of his shares pursuant to 8 *Del. C.* § 262.[181]

### J. Procedural History

On September 3, 2013, Nate initiated this action. On October 9, 2013, Nate filed the Verified Amended Complaint asserting four claims: breach of fiduciary duty against Cannon and Bryn as directors of ESG (Count I); breach of fiduciary duty against Cannon, Bryn, and Acquisition Corp. as controlling stockholders of ESG (Count II); aiding and abetting against Acquisition Corp. (Count III); and appraisal under 8 *Del. C.* § 262 against ESG (Count IV). In his prayer for relief, Nate sought, among other relief, rescissory damages.[182] On November 20, 2013, Defendants filed an Answer to the Amended Complaint. Discovery ensued. On September 29, 2014, Nate withdrew his request for rescissory damages. In November 2014, a four-and-a-half day trial was held. On March 17, 2015, I heard post-trial oral argument.

## III. LEGAL ANALYSIS

Because this combined appraisal and fiduciary duty action ultimately turns on the fair value of Nate's shares in ESG as of the Merger, I analyze Nate's statutory appraisal

---

[180] JX 280 (Letter from Energy Services Group, Inc. to Stockholders of Energy Services Group, Inc. (May 13, 2013)).

[181] JX 289 (Am. Compl.) at Ex. D. (Letter from Wayne Dennison to Energy Services Group, Inc. (May 21, 2013)); Pre-Trial Stip. ¶ II.D.36.

[182] JX 289 (Am. Compl.) at Prayer for Relief ¶ B.

claim first before addressing his fiduciary duty claims. For the reasons explained below, I conclude based on a discounted cash flow analysis that the fair value of Nate's stock as of the Merger was $42,165,920. It follows that the Merger was not entirely fair, primarily because it was not effectuated at a fair price. I further find that damages for Nate's breach of fiduciary duty claims are equivalent to the appraised value of his stock.

## A. Count IV: Appraisal

In Count IV of the Amended Complaint, Nate petitions the Court under 8 *Del. C.* § 262 to determine the fair value of his stock as of the Merger. Nate demanded the appraisal of his shares on May 21, 2013, and filed a claim for appraisal in this Court on September 3, 2013, both of which occurred within the time periods required under the statute.[183]

"An action seeking appraisal is intended to provide shareholders who dissent from a merger, on the basis of the inadequacy of the offering price, with a judicial determination of the fair value of their shares."[184] Under 8 *Del. C.* § 262(h), I must "determine the fair value of the shares" by "tak[ing] into account all relevant factors." Both the petitioner seeking appraisal and the surviving corporation bear the burden of proof, and I am obligated to use my independent judgment to determine fair value,[185]

---

[183] *See* 8 *Del. C.* § 262(d)(2) (requiring, where a merger is approved by stockholder written consent, a stockholder to demand appraisal within twenty days of the date of mailing of notice); 8 *Del. C.* § 262(e) (requiring a stockholder to commence an appraisal proceeding within 120 days after the effective date of a merger).

[184] *Cavalier Oil Corp. v. Harnett*, 564 A.2d 1137, 1142 (Del. 1989).

[185] *See Montgomery Cellular Hldg. Co., Inc. v. Dobler*, 880 A.2d 206, 221 (Del. 2005).

meaning "the value to a stockholder of the firm as a going concern."[186] As the Delaware Supreme Court explained over sixty years ago in *Tri-Continental Corp. v. Battye*,[187] the concept of "fair value" includes "market value, asset value, dividends, earning prospects, the nature of the enterprise and any other facts which were known or which could be ascertained as of the date of merger and which throw any light on future prospects of the merged corporation."[188] More recent decisions reiterate that "elements of future value, including the nature of the enterprise, which are known or susceptible of proof as of the date of the merger and not the product of speculation, may be considered."[189]

"[I]t is within the Court of Chancery's discretion to select one of the parties' valuation models as its general framework, or fashion its own, to determine fair value in the appraisal proceeding."[190] In doing so, I may consider any valuation methodology that is "generally considered acceptable in the financial community and otherwise admissible in court."[191] The parties' post-trial briefing focused exclusively on the use of a discounted cash flow (DCF) analysis. Thus, this is methodology I use to determine fair value in this case.

---

[186] *Golden Telecom, Inc. v. Global GT LP*, 11 A.3d 214, 217 (Del. 2010).

[187] 74 A.2d 71 (Del. 1950).

[188] *Id.* at 72.

[189] *Weinberger v. UOP, Inc.*, 457 A.2d 701, 713 (Del. 1983).

[190] *Cede & Co. v. Technicolor, Inc.*, 684 A.2d 289, 299 (Del. 1996).

[191] *Weinberger*, 457 A.2d at 713.

"[T]he DCF valuation methodology has featured prominently in this Court because it 'is the approach that merits the greatest confidence' within the financial community."[192]

> Put in very simple terms, the basic DCF method involves several discrete steps. First, one estimates the values of future cash flows for a discrete period . . . . Then, the value of the entity attributable to cash flows expected after the end of the discrete period must be estimated to produce a so-called terminal value, preferably using a perpetual growth model. Finally, the value of the cash flows for the discrete period and the terminal value must be discounted back[.][193]

The fact that ESG had no outstanding debt as of the Merger simplifies my analysis because ESG's enterprise value is equal to its equity value. Although the parties agree on the DCF methodology, they disagree on certain key inputs to the DCF model. I summarize below the experts' competing valuations and then analyze the five areas of disagreement between the parties.

Nate's expert, Yvette R. Austin Smith of The Brattle Group, performed a DCF analysis based on the 2013 Projections, which projected EBITDA and the other inputs necessary to calculate the Company's free cash flows for the years 2013-2017.[194] She

---

[192] *Cede & Co. v. JRC Acq. Corp.*, 2004 WL 286963, at *2 (Del. Ch. Feb. 10, 2004) (quoting *Ryan v. Tad's Enters., Inc.*, 709 A.2d 682, 702 (Del. Ch. 1996), *aff'd*, 693 A.2d 1082 (Del. 1997) (TABLE)).

[193] *Andaloro v. PFPC Worldwide, Inc.*, 2005 WL 2045640, at *9 (Del. Ch. Aug. 19, 2005).

[194] Austin Smith also performed a comparable companies analysis in her report. JX 331 (Austin Smith Report) at ¶¶ 55-63, Ex. 6. She gave 25% weight to her comparable companies valuation ($45.6 million) and 75% weight to her DCF valuation ($53.7 million). *Id.* at ¶ 64. Because Nate did not discuss the comparable companies analysis in

concluded that it was appropriate to tax affect ESG's tax rate in her DCF model to reflect the Company's Subchapter S status, and she used a tax rate of 21.5%.[195] Although Austin Smith derived a weighted average cost of capital (WACC) of 13.28%, Nate has since accepted the 14.13% discount rate proposed by ESG's expert.[196] Austin Smith assumed a terminal growth rate of 5.0%.[197] Austin Smith also calculated Nate's ownership percentage of ESG as 33.3%, but she acknowledged that Nate's share of ESG's $17.4 million cash on hand at the Merger may need to be adjusted to reflect discrete tax liabilities.[198] Based on the foregoing assumptions, Austin Smith concluded in her report that Nate's stock in ESG was worth $51.7 million total, or $39.15 per share[199] Based on a revised post-trial calculation of his percentage ownership and adjustments to the Company's cash on hand, Nate submits that the fair value of his stock was $52.65 million, or $39.89 per share.[200]

---

his post-trial briefing, I treat that valuation as waived. *See Emerald P'rs v. Berlin*, 726 A.2d 1215, 1224 (Del. 1999).

[195] JX 331 (Austin Smith Report) at ¶¶ 45-46.

[196] Pl.'s Op. Br. 29 n. 10.

[197] JX 331 (Austin Smith Report) at ¶¶ 52-53, 65.

[198] JX 340 (Austin Smith Rebuttal Report) at ¶ 5.

[199] JX 331 (Austin Smith Report) at ¶¶ 64-65.

[200] Tr. of Oral Arg. 80-81.

ESG's expert, E. Allen Jacobs of Berkeley Research Group, LLC, also performed a DCF analysis of ESG.[201] Jacobs did not base his DCF analysis on the 2013 Projections. Instead, Jacobs created his own set of ten-year projections for the years 2013-2023 based on per-unit calculations of revenues and costs.[202] His projections for the years 2013-2017 are considerably lower than those in the 2013 Projections. Jacobs asserted that it was not appropriate to tax affect ESG's earnings and calculated the appropriate tax rate to be 44.8%. Alternatively, he proposed a 34.1% tax rate if ESG's earnings are tax affected.[203] Jacobs computed a WACC of 14.13%, which Nate has accepted, and he calculated a terminal growth rate of 3.0%.[204] Based on these assumptions, Jacobs concluded that the DCF value of the Company's future cash flows was $53.1 million and that its net cash on hand was $11.9 million such that ESG was worth $65.0 million at the Merger.[205] Based on its post-trial calculation of Nate's ownership percentage as 33.08%, ESG contends that the fair value of Nate's stock in ESG was worth $21.502 million.

The parties disagree in five respects over the proper inputs for a DCF valuation of ESG: (i) the source of the projections of the Company's future performance; (ii) whether

---

[201] Jacobs concluded that any comparable companies or comparable transaction analysis was not informative of ESG's value due to insufficient data on comparables companies and transactions. JX 332 (Jacobs Report) at ¶¶ 129-36.

[202] *Id.* at ¶¶ 138-54.

[203] JX 339 (Jacobs Rebuttal Report) at ¶¶ 63-78.

[204] JX 332 (Jacobs Report) at ¶¶ 166-81.

[205] *Id.* at ¶ 201.

ESG's earnings should be tax affected due to its status as a Subchapter S corporation; (iii) the terminal growth rate; (iv) the proper treatment of the cash on ESG's balance sheet as of the Merger; and (v) Nate's ownership percentage of the Company. Most of the delta between the parties' competing valuations ($52.65 million versus $21.502 million) relates to the first two issues. I address each in turn.

### 1. The 2013 Projections

Nate contends that the 2013 Projections "were prepared by ESG management as part of a careful and deliberate process and reflected management's best estimate at the time of the Merger of the Company's expected performance."[206] For support, he cites to contemporaneous documents in the record reflecting how Cannon prepared and revised the assumptions in the 2013 Projections in anticipation of cashing Nate out of ESG, as well as testimony from Grant Thornton's Resnick about the creation and evolution of the 2013 Projections.

ESG argues that the 2013 Projections "lack appropriate indicia of reliability for [a] DCF valuation" because they "were not the product of a robust process that included a broad management team, were not developed within ESG's ordinary course of business, did not involve a thorough review of ESG's or industry drivers, and were accepted by Defendants in the hope that a high merger price would avoid litigation."[207] ESG asserts

---

[206] Pl.'s Reply Br. 30.

[207] Defs.' Ans. Br. 63.

that I should appraise the fair value of Nate's stock as of the Merger by performing a DCF valuation using Jacobs's cash flow projections.

For the reasons explained below, based on the trial record, I agree with Nate that the 2013 Projections reflected management's best estimates of what was known or knowable about ESG's future performance as of the Merger.

"[M]ethods of valuation, including a discounted cash flow analysis, are only as good as the inputs to the model."[208]  When performing a DCF analysis to determine the fair value of stock, Delaware courts tend to place great weight on contemporaneous management projections because "management ordinarily has the best first-hand knowledge of a company's operations."[209]  Management also typically "has the strongest incentives to predict the company's financial future accurately and reliably."[210]  That said, it may be appropriate to reject a DCF analysis based on management-created projections "where the company's use of such projections was unprecedented, where the projections were created in anticipation of litigation, or where the projections were

---

[208] *Neal v. Ala. By-Products Corp.*, 1990 WL 109243, at *9 (Del. Ch. Aug. 1, 1990), *aff'd*, 588 A.2d 255 (Del. 1991).

[209] *Doft & Co. v. Travelocity.com Inc.*, 2004 WL 1152338, at *5 (Del. Ch. May 20, 2004, revised May 21, 2004); *see also In re Emerging Commc'ns, Inc. S'holders Litig.*, 2004 WL 1305745, at *14 (Del. Ch. May 3, 2004, revised June 4, 2004) ("This Court has consistently expressed a preference for the most recently prepared management projections available as of the merger date.").

[210] *In re Nine Sys. Corp. S'holders Litig.*, 2014 WL 4383127, at *40 (Del. Ch. Sept. 4, 2014).

created for the purpose of obtaining benefits outside the company's ordinary course of business."[211]

Here, the record reflects that Cannon, ESG's top executive since Nate's removal in August 2009, engaged in a deliberate, iterative process over a period of three years to create, update and revise multi-year projections for the Company. This process began with the 2010 Projections Cannon created in February 2010, continued with the 2012 Projections he created in early 2012, which were revised in mid-2012, and culminated with the 2013 Projections that Grant Thornton prepared at Cannon's direction and with his input.[212] Resnick's unbiased testimony and Grant Thornton's internal documents both confirm that ESG (not Grant Thornton) supplied the growth assumptions in the 2013 Projections, as revised from the Revised 2012 Projections.[213]

Although Cannon was likely the only ESG employee who had a direct role in the creation of the 2013 Projections, which were derived from his 2013 annual budget, that does not undermine the reliability of the 2013 Projections in my view because Cannon regularly met with ESG's management to review the Company's sales and operations, including through exhaustive two-hour meetings that were held weekly.[214] ESG

---

[211] *Huff Fund Inv. P'rship v. CKx, Inc.*, 2013 WL 5878807, at *9 (Del. Ch. Nov. 1, 2013), *aff'd*, -- A.3d --, 2015 WL 631586 (Del. Feb. 12, 2015) (TABLE).

[212] Tr. 484, 486-87, 490-91, 508-10 (Resnick).

[213] *Id.* 493, 513 (Resnick); JX 255 (Email from Len Batsevitsky to Oksana Westerbeke (Mar. 19, 2013)).

[214] Tr. 33-34, 160-61 (Cannon), 305 (Purdum), 357 (Gurule), 583 (Fenton).

employees also routinely updated Cannon about customer-specific challenges and opportunities they observed.[215] It is thus no surprise Cannon admitted that he is "very familiar" with the Company's lines of business and specific customers and agreed that "ESG's revenues have generally been predictable."[216] Given the regular feedback Cannon received from other members of management, the relatively small size of the Company ($32.2 million in revenue in 2012) and its limited operations (three closely related lines of business), I find that Cannon was extremely well informed about the Company's prospective growth and that he brought this knowledge to bear on the 2013 Projections.

This is not a case, as in *In re John Q. Hammons Hotels Inc. Shareholder Litigation*,[217] where projections prepared by management failed to account for contemporaneous or anticipated business developments.[218] Rather, as Cannon testified, he updated the 2013 Projections to reflect the Company's growth prospects as of the Merger. In particular, in March 2013, Cannon carefully revised his 2013 annual budget, the base year for the 2013 Projections, on a line-by-line basis to reflect the recent loss of

---

[215] *See, e.g.*, JX 170 (Email from Carol Purdum to Lynn Cannon (July 5, 2012)) at ESG00100820; JX 236 (Email from Carol Purdum to Bob Potter (Feb. 26, 2013)) at ESG00085988.

[216] Tr. 159-60, 178-79 (Cannon).

[217] 2011 WL 227634 (Del. Ch. Jan. 14, 2011).

[218] *See id.* at *4-6 (rejecting an expert's reliance on management projections based on "overly optimistic assumptions" in part because they "failed to account for the sale of three properties . . . after the projections were prepared").

46

Viridian as a customer and competitive changes in the market.[219] Cannon also directed

Grant Thornton to make certain changes to the 2013 Projections to reflect increased costs

from the time of the Revised 2012 Projections.[220] Those changes were significant. They

resulted in decreasing ESG's projected EBIT between 29.3% and 41.3% for each of the

years from 2013 to 2017, and in reducing ESG's operating margin in 2017 (the final year

of the discrete period) from 56.6% to 43.9%.[221] The reasonableness of the 2013

Projections was tested, albeit perhaps not as robustly as one might see in a third-party

transaction, through discussions with Grant Thornton.[222] And ESG management

confirmed the 2013 Projections to be accurate just days before the Merger.[223]

I also find that Cannon worked with Grant Thornton to revise the 2013 Projections

downward significantly at a time when he knew he would force Nate out of the

Company, if necessary, based on a valuation derived from those projections. Cannon

testified that he decided to cash out Nate in January 2013.[224] After making up his mind to

do so, Cannon undertook to adjust the assumptions underlying the 2013 Projections,

resulting in material decreases to the Company's projected future performance justified

by the loss of Viridian and other perceived competitive pressures. Then, when Nate did

---

[219] Tr. 193 (Cannon).

[220] *Id.* 111-12, 116, 193-94 (Cannon), 508-10 (Resnick).

[221] *See supra* Tables 3-4.

[222] Tr. 484, 486-87 (Resnick).

[223] JX 272 (Email from Len Batsevitsky to Barry Klickstein (May 3, 2013)).

[224] Tr. 101, 193 (Cannon).

47

not respond to ESG's March 2013 buyout proposal, which was based on the Grant Thornton Valuation using the 2013 Projections, the Merger followed as a matter of course a few weeks later at essentially the same price.

Cannon's motive for deciding to force Nate out of the Company at this point was obvious and admitted: he and Bryn wanted "to stop the hemorrhage"[225] of paying millions of dollars in equity distributions to Nate who had not worked at the Company since August 2009. I reject as an after-the-fact rationalization ESG's assertion that I should find the 2013 Projections to be overly optimistic because they supposedly offered Nate a "premium" to "avoid continued litigation."[226] To the contrary, Cannon was motivated in my view to make the assumptions in the 2013 Projections as conservative (*i.e.*, reliable) as possible because he knew full well when they were created that they could set the price to force Nate out of the Company involuntarily, which was an invitation to litigation.

Notably, Cannon authorized Grant Thornton to submit the 2013 Projections to Citizens Bank in connection with obtaining a $25 million credit facility to finance the purchase of Nate's shares.[227] As then-Vice Chancellor Strine observed in *Delaware Open MRI Radiology Associates, P.A. v. Kessler*,[228] because it is a federal felony "to

---

[225] *Id.* 208-09 (Cannon).

[226] Defs.' Ans. Br. 72.

[227] Tr. 512 (Resnick); JX 265 (Email from Len Batsevitsky to Denise McGeough (Apr. 4, 2013)).

[228] 898 A.2d 290 (Del. Ch. 2006).

knowingly obtain any funds from a financial institution by false or fraudulent pretenses or representations," projections that are provided to a financing source are typically given "great weight" by this Court.[229] The undisputed fact that Grant Thornton submitted the 2013 Projections to a financial institution at Cannon's direction further supports my conclusion that the 2013 Projections reflected management's best estimate of ESG's future performance. If the 2013 Projections were a reliable basis to obtain debt financing, then there is no reason to conclude that they were an unreliable basis to value the Company.[230]

In support of its position that the 2013 Projections are not reliable, ESG draws heavily on principles discussed in *Huff Fund Investment Partnership v. CKx, Inc.*,[231] *Gearreald v. Just Care, Inc.*,[232] and *In re Nine Systems Corp. Shareholders Litigation*.[233] Each of those cases is distinguishable from the record here.

---

[229] *See id.* at 332, 332 n.109 (citing 18 U.S.C. § 1344 (2006)).

[230] *See Emerging Commc'n*, 2004 WL 1305745, at *13 ("If contemporaneous reliance upon the June projections by [the corporation's controlling stockholder], his lender and his financial and legal advisors was appropriate, then logic and common sense dictate that reliance on those same projections by [the plaintiff's expert] in performing his valuation was no less appropriate.").

[231] 2013 WL 5878807 (Del. Ch. Nov. 1, 2013), *aff'd*, -- A.3d --, 2015 WL 631586 (Del. Feb. 12, 2015) (TABLE).

[232] 2012 WL 1569818 (Del. Ch. Apr. 30, 2012).

[233] 2014 WL 4383127 (Del. Ch. Sept. 4, 2014), *appeal docketed* No. 281,2015 (Del. June 5, 2015).

In *CKx*, after reviewing how management created the company's projections, the Court concluded that the basis for a projected increase in licensing fees under a material, to-be-negotiated contract was speculative because "[i]nitial estimates of those revenues were markedly lower than projections provided to potential buyers and lenders," which rendered the entirety of the company's revenue projections inherently unreliable.[234] Unlike in *CKx*, ESG has not identified any particular line item or line of business in the 2013 Projections that is so uncertain as to undermine the integrity of the overall projections.

In *Just Care*, the Court declined to defer to management's projections, which were the first set of multi-year projections the company had ever prepared and thus were "made outside of the ordinary course of business."[235] Unlike in *Just Care*, the 2013 Projections were not Cannon's first crack at creating and/or revising multi-year projections. Cannon had done so three times before: the 2010 Projections, the 2012 Projections, and the Revised 2012 Projections. He also had felt confident enough in his earlier work product to share the 2012 Projections with ESG management at a planning conference to set revenue targets, and to submit the Revised 2012 Projections to several banks to finance a potential buyout of Nate and to one bank (Wells Fargo) to conduct a

---

[234] *See CKx*, 2013 WL 5878807, at *9, *11 ("Because I have little confidence in the reliability of using *or* excluding the estimated $20 million increase in revenues under the to-be-negotiated *American Idol* contract, I conclude that a DCF analysis is not the appropriate method of valuation in this case.").

[235] *Just Care*, 2012 WL 1569818, at *4 (Del. Ch. Apr. 30, 2012).

debt covenant analysis.[236] The concerns in *Just Care* about projections being created by novices are further assuaged here because the 2013 Projections were created with the assistance of a financial advisor, Grant Thornton, with whom Cannon reviewed the revenue growth assumptions.[237]

Finally, in *Nine Systems*, the Court rejected as unreliable a set of one-year financial projections management had prepared and presented to the board because the projections were "inconsistent with the corporation's recent performance."[238] Specifically, the projections were found unreliable because management had "overestimated the [c]ompany's revenues even two to three months away . . . by more than a factor of three."[239] Here, by contrast, ESG's performance in March and April 2013, shortly before the Merger, was in line with the 2013 Projections.[240]

Separately, I find that the ten-year projections Jacobs prepared in connection with this litigation are not reflective of management's best estimate of future performance as of the Merger. In valuing the Company, Jacobs analyzed the "fundamentals" of ESG: its lines of business, its sales opportunities, its sales won and lost, its individual customers, its market, its competition, and its growth. His process involved discussions with ESG

---

[236] Tr. 172, 189 (Cannon); JX 187 (Email from Lynn Cannon to Francois Karl-Henry (Sept. 28, 2012)).

[237] Tr. 484, 486-87, 490-91, 493, 510 (Resnick).

[238] *Nine Sys.*, 2014 WL 4383127, at *41.

[239] *Id.* at *42.

[240] Tr. 221-22 (Cannon).

51

management in 2014 and input from ESG's industry expert, Peter Weigand.[241] Based on his analysis, Jacobs projected, on a per unit basis, the Company's future revenue for the years 2013-2023.[242]

Compared to the 2013 Projections, Jacobs's projections are pessimistic, *i.e.*, they project lower revenue, primarily in the Company's TMS line of business. Over the period from 2009 to 2012, TMS revenue had grown from $12.34 million to $18.76 million. In the 2013 Projections, Cannon projected consistent growth for the years 2013-2017, albeit at a slower pace than in the years 2009-2012.[243] In sharp contrast, Jacobs projected that, going forward, TMS revenue would decline to $12.74 million in 2020 and then slowly increase to $13.67 million in 2023.[244]

Delaware courts are generally skeptical of projections created by an expert during litigation. "Expert valuations that disregard contemporaneous management projections are sometimes completely discounted."[245] In *Taylor v. American Specialty Retailing Group, Inc.*,[246] for example, an expert hired by the company (Dunham) "ignored a contemporaneous set of projections prepared by Dunham's management," and instead performed a DCF analysis in that appraisal proceeding based "on far more pessimistic

[241] *See, e.g.*, JX 332 (Jacobs Report) at ¶ 108; Tr. 1231-32 (Jacobs).

[242] JX 332 (Jacobs Report) at Ex. C1.

[243] JX 264 (2013 Projections) at NO00000046, 52.

[244] JX 332 (Jacobs Report) at ¶ 145, Ex. C1.

[245] *JCR Acq. Corp.*, 2004 WL 286963, at *2.

[246] 2003 WL 21753752 (Del. Ch. July 25, 2003).

assumptions of Dunham's future prospects that he prepared on his own." The Company's Chief Financial Officer also refused to endorse the expert's valuation. For these reasons, the Court concluded that the expert's calculation "lacks credibility."[247]

Then-Vice Chancellor Strine reached a similar conclusion in *Agranoff v. Miller*.[248] There, the company's expert concluded that management's projections were an unreliable basis for a DCF analysis, but the expert nonetheless performed a DCF calculation based on "a substantial negative revision to those projections that he came up with after discussions with . . . managers after the valuation date."[249] In rejecting the expert's analysis, then-Vice Chancellor Strine concluded that "[t]he possibility of hindsight bias and other cognitive distortions seems untenably high," particularly since the expert had consulted with an individual interested in the outcome of the case about the negative revisions.[250]

In my opinion, consistent with *Taylor* and *Agranoff*, the after-the fact projections Jacobs created for purposes of this litigation are tainted by hindsight bias[251] and are not a reliable source to determine the fair value of Nate's shares as of the Merger. Jacobs first

---

[247] *Id.* at *2, *2 n.7.

[248] 791 A.2d 880 (Del. Ch. 2001).

[249] *Id.* at 891.

[250] *See id.* at 892, 892 n.25.

[251] *See In re Citigroup Inc. S'holder Deriv. Litig.*, 964 A.2d 106, 124 n.50 (Del. Ch. 2009) (defining "hindsight bias" as "the tendency for people with knowledge of an outcome to exaggerate the extent to which they believe that outcome could have been predicted." (citation omitted)).

spoke with ESG management about valuation issues in the spring of 2014, approximately one year after the Merger,[252] when this litigation was well underway. The key individual with whom Jacobs discussed the Company's future prospects—Cannon[253]—had a strong financial interest for Jacobs to believe that management did not think that the 2013 Projections were reliable. As Cannon acknowledged at trial, every dollar paid to Nate in the Merger is approximately $0.50 out of his own pocket.[254] The rest of the payment would come out of the pockets of only a few other senior managers: Bryn, Gurule and Fenton. The financial incentive for them to steer Jacobs toward a lower valuation of the Company, even if only subconsciously, is just too great to overcome in this case.

Indeed, Jacobs testified that, based on conversations he had with ESG management in 2014, he understood the 2013 Projections to be inconsistent with the contemporaneous beliefs of management.[255] But this understanding is belied by the trial record in my view, which demonstrates that the 2013 Projections were reflective of management's best estimate of the Company's future performance as of the Merger. Jacobs's projections also assume that the Merger occurred at the "very peak" of ESG's

---

[252] Tr. 1237 (Jacobs).

[253] JX 339 (Jacobs Rebuttal Report) at ¶ 84.

[254] Tr. 204-05 (Cannon).

[255] *Id.* 1237-38 (Jacobs); *see also* JX 339 (Jacobs Rebuttal Report) at ¶¶ 84-85.

performance, at an "inflection point" when ESG went from a growing company to a declining company, which Cannon conceded would have been "pretty stupid" to do.[256]

In sum, I see no basis to depart from the reasoned principle recited in *Taylor*, *Agranoff*, and elsewhere to be chary of relying on an expert's *post hoc*, litigation-driven forecasts where, as here, contemporaneous, reliable projections prepared by management are available.[257] I am persuaded that the 2013 Projections were ESG management's best estimates of the Company's future performance as of the Merger, and provide a reliable basis for performing a DCF valuation. Thus, I use the 2013 Projections in my DCF analysis and give no weight to Jacobs's projections.

## 2. The Tax Rate

The DCF model requires a corporate-level tax rate to calculate the Company's projected free cash flows.[258] But, as a Subchapter S corporation, ESG does not pay any corporate-level income taxes. Instead, ESG's income is taxed only once at the investor level at the stockholder's ordinary income rate (rather than at the lower dividend rate).[259] This different tax treatment means that stockholders in a Subchapter S corporation such

---

[256] Tr. 212-13 (Cannon).

[257] *See Gray v. Cytokine Pharmascienes, Inc.*, 2002 WL 853549, at *8 (Del. Ch. Apr. 25, 2002) (rejecting an expert's calculation that disregarded management's revenue projections and that adjusted other projections where there were no "valid reasons to warrant all of the[] adjustments"); *see also Merion Capital, L.P. v. 3M Cogent, Inc.*, 2013 WL 3793896, at *11-12 (Del. Ch. July 8, 2013) (accepting management's projections, not the expert-created projections, "as a reliable starting point for the DCF analysis").

[258] JX 331 (Austin Smith Report) at ¶ 45.

[259] Tr. 1298 (Jacobs).

as ESG are able to receive distributions on a tax-advantaged basis when compared to stockholders in a Subchapter C corporation, where income is taxed twice: once at the corporate level, and again at the investor level (at the lower dividend rate).

As the Supreme Court stated in *Tri-Continental Corp.*, Nate is "entitled to be paid for that which has been taken from him."[260] A critical component of what was "taken" from Nate in the Merger was the tax advantage of being a stockholder in a Subchapter S corporation. As then-Vice Chancellor Strine reasoned in *Kessler*, "[a]n S corporation structure can produce a material increase in economic value for a stockholder and should be given weight in a proper valuation of the stockholder's interest."[261] The Court thus concluded that "when minority stockholders have been forcibly denied the future benefits of S corporation status, they should receive compensation for those expected benefits and not an artificially discounted value that disregards the favorable tax treatment available to them."[262]

Based on the testimony of Austin Smith, who I found more persuasive on this issue than Jacobs, I conclude that the Company's earnings should be tax affected in order to perform a DCF valuation that adequately compensates Nate for being deprived of his Subchapter S stockholder status.[263] This conclusion follows *Kessler*, in which then-Vice

---

[260] *Tri-Cont'l Corp.*, 74 A.2d at 72.

[261] *Kessler*, 898 A.2d at 327.

[262] *Id.* at 328.

[263] *See id.* at 330 (calculating a hypothetical S corporation tax rate of 29.4% by assuming a 15% dividend tax rate and a 40% personal income tax rate).

Chancellor Strine thoughtfully surveyed the case law and literature on this subject,[264] and is consistent with another recent decision of this Court that also followed *Kessler*.[265]

Before explaining my calculations, I address ESG's contention that any *Kessler*-based valuation must take into account the Company's policy with respect to distributed earnings, which Jacobs calculated to be 76.7%--the median of ESG's distributions for the years 2007-2012.[266] According to ESG, Nate should not receive any special Subchapter S value for earnings that are retained and reinvested in the Company. Thus, ESG proposes a tax rate in a *Kessler*-based valuation that would permit Nate to receive value from being a Subchapter S corporation stockholder for some of ESG's earnings (the 76.7% calculated by Jacobs) but not from any retained earnings (the 23.3% remainder).[267]

---

[264] *See id.* at 326 ("This dispute raises an interesting question of valuation, which has elicited a fair amount of attention from judges, appraisers, and academics.").

[265] *See Zutrau v. Jansing*, 2014 WL 3772859, at *36 (Del. Ch. July 31, 2014) (accepting a financial advisor's DCF calculation of a Subchapter S corporation that was based on an estimated "hypothetical 'pre-dividend S corporation tax rate' " of 28.8% (quoting *Kessler*, 898 A.2d at 330)).

Other jurisdictions also have cited *Kessler* with approval. *See Bernier v. Bernier*, 873 N.E.2d 216, 221 (Mass. 2007) ("Our review of the scant case law and the pertinent literature on the issues leads us to adopt generally the metric employed by the *Kessler* court[.]"); *see also Hamelink v. Hamelink*, 2013 WL 6839700, at *5 (Minn. Ct. App. Dec. 30, 2013) ("In light of *Kessler* and *Bernier*, we agree with husband that there is support for [his expert's] decision to tax affect.").

[266] JX 339 (Jacobs Rebuttal Report) at ¶ 70. *Kessler* itself acknowledges that "[t]he relative value of an S corporation, vis-à-vis a C corporation, to its shareholders is dependent upon the level of distributions paid." *Kessler*, 898 A.2d at 329.

[267] Tr. 1301-05 (Jacobs).

Jacobs calculated this rate to be 34.1%.[268] In my opinion, the Company's position is based on a false premise.

ESG did not reinvest any appreciable amount of its undistributed earnings in its business but instead kept those earnings as cash on its balance sheet. This is the reason the amount of cash and cash equivalents on ESG's balance sheet increased from $3.2 million in 2009 to $17.4 million in May 2013.[269] The record also does not contain any evidence suggesting that, as of the Merger, Cannon or anyone else at ESG intended to reinvest the cash it had accumulated in the business.[270] Nor was it necessary for ESG to reinvest earnings to grow. Both Austin Smith and Jacobs testified that the 2013 Projections included all of the capital expenditures necessary for ESG to generate the projected future cash flows.[271]

In my opinion, the operative metric under the *Kessler*-based valuation method is not the actual distributions made by a Subchapter S corporation, but the amount of funds that are available for distribution to stockholders. To conclude otherwise would run afoul of the rationale of *Tri-Continental Corp.* because Nate would be deprived of "his

---

[268] JX 339 (Jacobs Rebuttal Report) at ¶¶ 70-71.

[269] Tr. 1306-08 (Jacobs).

[270] It would inappropriate to consider post-Merger changes to the Company's reinvestment practices. *See, e.g.*, *Gonsalves v. Straight Arrow Publishers, Inc.*, 701 A.2d 357, 363 (Del. 1997) (concluding in an appraisal proceeding that a petitioner was not entitled to the pro rata value of "possible changes which may be made by new management" after the effective date of the transaction).

[271] Tr. 888 (Austin Smith), 1309 (Jacobs).

proportionate interest" in ESG as a "going concern,"[272] which includes the Subchapter S corporation benefits that inure to earnings that are distributed and retained.

Table 5 below reflects my calculation, under *Kessler*, of the hypothetical corporate tax rate for ESG that "treat[s] the S corporation shareholder [*i.e.*, Nate] as receiving the full benefit of untaxed dividends, by equating [his] after-tax return to the after-dividend return to a C corporation shareholder."[273]  For this purpose, I use Jacobs's calculation of ESG's effective state and federal tax rate to be 43%, which Nate has accepted.[274] Because Nate was the only stockholder cashed out in the Merger, I also accept Austin Smith's calculation of Nate's actual tax rates as a Maine resident rather than Jacobs's calculation of "hypothetical" tax rates for a Massachusetts stockholder.  Thus, I calculate the tax rate Nate would pay on distributions from a Subchapter C corporation to be 31.75%, which is the sum of the 20% federal tax on dividends, the 3.8% Net Income Investment Tax (NIIT) imposed by the Affordable Care Act,[275] and the 7.95% Maine state tax on dividends.[276]  I also calculate the tax rate that Nate would pay on distributions from a Subchapter S corporation to be 47.25%, which is the sum of Nate's actual 35.5%

---

[272] *Tri-Cont'l Corp.*, 74 A.2d at 72.

[273] *Kessler*, 898 A.2d at 330.

[274] JX 339 (Jacobs Rebuttal Report) at ¶¶ 69-71; Pl.'s Op. Br. 61.

[275] *See* 26 U.S.C. § 1411.

[276] I also accept Austin Smith's assumption that Nate's state taxes are effectively not deductible for federal tax purposes.  JX 331 (Austin Smith Report) at ¶ 46.

federal income tax rate (based on his 2012 tax returns),[277] the 3.8% NIIT, and the 7.95% Maine state tax.

| Table 5 Hypothetical Corporate Tax for ESG under *Kessler* | | | |
|---|---|---|---|
| | C Corp | S Corp | S Corp Valuation |
| Income Before Tax | $100 | $100 | $100 |
| Entity-Level Tax | 43% | 0% | 22.71% |
| Entity Net Earnings | $57 | $100 | $77.29 |
| Dividend/Personal Tax | 31.75% | 47.25% | 31.75% |
| Net to Investor | $38.90 | $52.75 | $52.75 |

Thus, I conclude that the appropriate tax rate to apply in my DCF valuation of Nate's interest in ESG at the time of the Merger is 22.71%.

### 3. The Terminal Growth Rate

In a typical DCF valuation, the terminal growth rate "attempt[s] to capture the future growth prospects of the firm while recognizing that over time firms cannot continue to grow at a rate that is materially in excess of the real growth of the economy."[278] Austin Smith offered a 5% terminal growth rate, calculated as a modest premium (0.5%) to the midpoint of three estimates of nominal U.S. GDP growth prepared in March 2013 for 2017 and onward (4.5%).[279] Jacobs proposed a terminal growth rate of

---

[277] Tr. 873-74, 883-84 (Austin Smith). I credit Austin Smith's testimony that it is appropriate to apply Nate's most recent, actual tax rate because there is no evidence in the record suggesting a different tax rate during the discrete discount period. *Id.* 885 (Austin Smith).

[278] *Andaloro*, 2005 WL 2045640, at *12.

[279] JX 331 (Austin Smith Report) at ¶¶ 52-53.

3%, calculated as a premium (1%) to the Federal Reserve's projection of inflation as of the Merger (2%).[280]

Although calculating the appropriate terminal growth rate is one of several challenging estimations for a law-trained judge tasked with determining a corporation's fair value,[281] two well-reasoned principles guide my analysis. In *Merion Capital, L.P. v. 3M Cogent, Inc.*,[282] the Court observed that, in most cases, "a terminal growth rate should not be greater than the nominal growth rate for the United States economy, because '[i]f a company is assumed to grow at a higher rate indefinitely, its cash flow would eventually exceed America's [gross national product].' "[283] Under the logic of *3M Cogent*, I find Austin Smith's 5% terminal growth rate too high for a company like ESG, which, as of the Merger, had matured into a company that was facing increasing competitive pressures and flatter growth after several years of relatively rapid growth in an environment of declining natural gas prices.

---

[280] JX 339 (Jacobs Rebuttal Report) at ¶¶ 102-08.

[281] *See, e.g.*, *In re Appraisal of Orchard Enters., Inc.*, 2012 WL 2923305, at *18 (Del. Ch. July 18, 2012) ("As a law-trained judge who has to come up with a valuation deploying the learning of the field of corporate finance, I choose to deploy one accepted method as well as I am able, given the record before me and my own abilities."), *aff'd*, 2013 WL 1282001 (Del. Mar. 28, 2013) (TABLE).

[282] 2013 WL 3793896 (Del. Ch. July 8, 2013).

[283] *Id.* at *21 (quoting Bradford Cornell, *Corporate Valuation: Tools for Effective Appraisal and Decision Making* 146-47 (1993)).

Conversely, as the Court noted in *Global GT LP v. Golden Telecom, Inc.*,[284] "the rate of inflation is the floor for a terminal value estimate for a solidly profitable company that does not have an identifiable risk of insolvency."[285] Because the 2013 Projections contemplate that ESG would remain profitable even after taking into account increasing competitive pressures as of the Merger, I find that it is appropriate under *Golden Telecom* to calculate the terminal growth rate as a premium to inflation. In my judgment, Jacobs's 3% rate strikes the appropriate balance. Indeed, a 3% rate is very close to the 2.5% rate utilized in the Grant Thornton Valuation contemporaneous with the Merger.[286]

Courts have acknowledged that a non-trivial spread in the growth rate for the discrete forecast period and the terminal growth rate is common.[287] Thus, the 3% difference between the revenue growth rate in the final year of the 2013 Projections (6.0% for 2017) and the terminal growth rate I adopt (3%) should not be controversial. There also is considerable precedent in Delaware for adopting a terminal growth rate that is a premium, such as 100 basis points, over inflation.[288] Additionally, the fact that ESG's own expert proposed a 3% terminal growth rate in connection with his projections

---

[284] 993 A.2d 497 (Del. Ch. 2010), *aff'd*, 11 A.3d 214 (Del. 2010).

[285] *Id.* at 511.

[286] JX 264 (Grant Thornton Valuation) at NO00000052.

[287] *See, e.g.*, *S. Muoio & Co. LLC v. Hallmark Entm't Invs. Co.*, 2011 WL 863007, at *21 (Del. Ch. Mar. 9, 2011), *aff'd*, 35 A.3d 419 (Del. 2011) (TABLE).

[288] *See, e.g.*, *Kessler*, 898 A.2d at 334, 337 (adopting a 4% terminal growth rate where inflation was estimated to be 3%); *JRC Acq. Corp.*, 2004 WL 286963, at *6 (adopting a 3.5% terminal growth rate where inflation was estimated to be 2.5%).

for the Company, which were unduly pessimistic in comparison to the 2013 Projections, compels the conclusion that the terminal growth rate must be at least 3%. I therefore adopt a 3% terminal growth rate.

### 4. The Cash on ESG's Balance Sheet

ESG had approximately $17.4 million in cash and cash equivalents on its balance sheet as of the Merger.[289] It is undisputed that Nate is entitled to receive a pro rata share of the "excess" cash that could have been distributed to stockholders at that time. At post-trial argument, Nate conceded that $2.3 million should be deducted to reflect certain income tax liabilities.[290] ESG argues that it is necessary to further deduct (i) $916,000 as working capital; and (ii) $2.3 million for a Texas sales and use tax liability.

#### a. Working Capital

Jacobs opined that $916,000 in cash, roughly 3% of ESG's 2012 revenue, should be set aside as the Company's working capital. He considered this amount to be an "extremely conservative estimate."[291] Austin Smith assumed that ESG did not need a working capital reserve because ESG generated millions of dollars in cash every month.[292] The trial record supports Jacobs's estimation. Cannon testified that Nate agreed upon the Company's "long-standing practice" to retain a percentage of earnings to

---

[289] Tr. 1330 (Jacobs); JX 332 (Jacobs Report) at ¶¶ 195.

[290] Tr. of Oral Arg. 61.

[291] JX 332 (Jacobs Report) at ¶ 196.

[292] JX 340 (Austin Smith Rebuttal Report) at 17.

use for "[c]apital expenditures, as well as other corporate matters." According to Cannon, who described himself as "a very conservative kind of guy," having no cash on hand would not be a "prudent thing to do."[293] In my opinion, although there is no direct evidentiary support for a working capital reserve of 3% of revenue, I credit Cannon's testimony on this point and thus accept Jacobs's estimate that ESG's cash on hand at the Merger should be decreased by $916,000.

### b. Texas Use and Sales Tax

In 2012, ESG discovered that it was subject to a use and sales tax imposed by Texas on "data processing services" in the state, which the Company had not paid for over a decade.[294] Assuming that none of the Company's customers paid this tax on their own, ESG's controller, Swift, estimated in April 2012 that the Company's potential liability was $2.6 million. In an updated analysis in July 2013, she estimated that the tax could be as high as $3.136 million.[295] In the third or fourth quarter of 2013, the Company hired a tax consultant, who subsequently estimated that the tax liability was around $1.2 million.[296] In March 2014, ESG eventually contacted its clients over the course of a week, learned that several had been paying the tax, and determined that its liability for

---

[293] Tr. 38-39 (Cannon).

[294] Swift Dep. 135-36, 138.

[295] *Id.* 139-40, 144, 146.

[296] *Id.* 148.

the Texas sales and use tax was $448,389, with the amount attributable to the period before the Merger being $373,168.[297]

Based on his conversations with ESG management, Jacobs calculated that a low estimate of the Texas tax as of the Merger date was $1.6 million. Jacobs then determined that the midpoint of Swift's $3.1 million calculation and his own $1.6 million estimate, calculated as $2.3 million, was a reasonable expectation of ESG's obligation as of the Merger.[298] Nate disagrees. He argues that, under *Tri-Continental Corp.*, Jacobs's calculation does not accurately reflect what was "knowable" about the Texas use tax because determining the Company's tax liability was an "empirical exercise" that "could easily have been conducted as of the date of the Merger."[299] He submits that the correct amount to deduct for the Texas tax liability was $375,000.

Because ESG's management did not know for over a decade about the Texas sales and use tax, I do not accept Swift's $3.1 million estimation, or Jacobs's derivative estimation, as fairly representative as what was "knowable" about this liability at the Merger. In my view, ESG's tax consultant's estimate of $1.2 million, despite being calculated several months after the Merger, is the best available proxy for what was knowable about this liability as of the Merger.

\* \* \*

---

[297] *Id.* 155-56, 164.

[298] JX 332 (Jacobs Report) at ¶ 198.

[299] Pl.'s Op. Br. 68.

With the foregoing deductions, I conclude that ESG's "excess" cash on hand as of the Merger totaled $12.984 million ($17.4 million minus $2.3 million, minus $916,000, minus $1.2 million).

### 5. Nate's Ownership Percentage

The final area of disagreement between the parties concerns Nate's ownership percentage of the Company. The shareholdings of Nate (1,320,000 shares) and Acquisition Corp. (2,430,000 shares) in ESG at the time of the Merger are not in dispute. In percentage terms, Nate contends that he owned 35.2% of the Company, but ESG contends that he owned only 33.08%. The dispute stems from whether 240,000 "performance units" granted to other ESG employees, which the board of ESG ratified when approving the Merger,[300] should be included in a fully diluted valuation of the Company.

Drew Fenton has what amounts to a phantom stock agreement for 150,000 shares of ESG. He regularly receives pro rata distributions for those phantom shares.[301] Bob Potter has 50,000 vested stock options that, according to Cannon, are exercisable in the event of a change of control, which does not include the Merger.[302] Neither Nate nor ESG presented any evidence probative of the terms of the other 40,000 performance units

---

[300] JX 278 (Resolutions of the Board of Directors of Energy Services Group, Inc. (May 6, 2013)) at NO00000249-50.

[301] Tr. 558-60 (Fenton); Cannon Dep. 18-19.

[302] Cannon Dep. 16-17; Tr. 407-08 (Potter).

referenced in the board resolution approving the Merger, so I will not include those units in my calculation of Nate's percentage interest.

When Jacobs performed a normalization of the compensation Cannon, Bryn, and Gurule received as ESG stockholders in the manner discussed above, he did not change Fenton's compensation because Fenton's "total compensation approximat[ed] a market salary."[303] In other words, Jacobs determined that Fenton's salary and bonus as an ESG employee and his distributions as the holder of 150,000 phantom shares historically approximated a market-rate salary for someone in his position.

Nate contends that, because Fenton's compensation was not normalized, it would be double-counting to also include Fenton's 150,000 phantom shares for purposes of determining the fair value of Nate's interest on a fully diluted basis. I disagree. The fact that Fenton's total compensation as an employee and as a holder of phantom shares historically approximated market-rate compensation does not change the reality that, in the future, Fenton would still be entitled to distributions for those 150,000 phantom shares in the same manner that Cannon or Bryn are entitled to distributions. In other words, from my perspective, Jacobs "normalized" Fenton's compensation by not changing it in his projections.[304] Because the parties have assumed that Grant Thornton

---

[303] JX 332 (Jacobs Report) at Ex. G.

[304] Consider the following example. Assume ESG's historical financials reflect that Cannon, Bryn and Fenton each received $5 in compensation per year but that their market rates were $10 each. Further assume that Cannon, Bryn, and Fenton historically received distributions of $100, $90 and $5, respectively. It would be logical to normalize the compensation expense for each of them by reallocating $5 from their distributions to compensation expense, which would mean that the amount of distributions attributable to

normalized the 2013 Projections for purposes of the Grant Thornton Valuation in a manner equivalent to Jacobs's own normalization process,[305] I find it is more likely than not that Fenton's phantom stock rights were functionally normalized in the 2013 Projections. I am thus persuaded that I should include Fenton's 150,000 phantom stock rights when calculating the number of outstanding shares of ESG as of the Merger.

As to Potter's 50,000 units, I exclude them from my calculation because they are exercisable only in the event of a change of control. My conclusion follows from then-Chancellor Strine's decision in *In re Appraisal of Orchard Enterprises, Inc.*[306] ESG argues that, under *Orchard*, I must value the Company on a fully diluted basis, *i.e.*, by including Potter's 50,000 units.[307] In my view, ESG's reading of *Orchard* misses the mark. *Orchard* was an appraisal action involving a company with a series of preferred stock that was entitled to participate in any dividends declared on common stock on an as-converted basis and that had a liquidation preference of $25 million, which was triggered in certain situations. In his post-trial decision, then-Chancellor Strine concluded that the possibility of an event triggering the liquidation preference was

their equity interests would be reduced to $95, $85 and $0, respectively. After normalizing ESG's historical financials in this manner and projecting future cash flows based on the same assumptions, which is what Jacobs did as I understand it, Cannon, Bryn, and Fenton would be entitled to share in equity distributions in the future on a *pro rata* basis.

[305] *See, e.g.*, Tr. 1226-27 (Jacobs).

[306] 2012 WL 2923305 (Del. Ch. July 18, 2012), *aff'd*, 2013 WL 1282001 (Del. Mar. 28, 2013 (TABLE).

[307] Defs.' Reply Br. 39-40.

68

"entirely a matter of speculation."[308]   Thus, when he determined the company's going concern value, he valued the preferred stock on an as-converted basis without deducting the liquidation preference because, "if [the company] remains a going concern, the preferred stockholders' claim on the cash flows of the company (if paid out in the form of dividends) is solely to receive dividends on an as-converted basis."[309]   Under the logic of *Orchard*, Potter's 50,000 units, which are only exercisable in a change of control, should not be included in valuing ESG because there is no evidence in the record suggesting that a change of control as of the Merger was anything but entirely speculative, and valuing ESG by reference to speculative events is inconsistent with Delaware appraisal law.[310]

*     *     *

Therefore, I find that Nate owned 1,320,000 of ESG's 3,900,000 outstanding shares at the time of the Merger,[311] which equates to 33.85% of the Company.

### 6.     The Fair Value of Nate's Interest in ESG

Appendix A reflects my DCF valuation of ESG as of the Merger based on the relevant items in the 2013 Projections, *i.e.*, the projections for EBITDA, depreciation and amortization, capital expenditures, and additional working capital for the years 2013-

---

[308] *Orchard*, 2012 WL 2923305, at *6.

[309] *Id.* at *7.

[310] *See, e.g.*, *Weinberger*, 457 A.2d at 713; *Orchard*, 2012 WL 2923305, at *8 ("[T]he duty of this court in an appraisal is . . . to make a determination of [the company's] value as a going concern, without reference to . . . speculative events.").

[311] This amount is the sum of Nate's shares (1,320,000) plus Acquisition Corp.'s shares (2,430,000) plus Fenton's phantom shares (150,000).

2017. For the terminal period, I calculated EBITDA based on a 3% growth rate, and I adopt Austin Smith calculation's for the other items.[312] I also apply a partial period adjustment to the year 2013 to represent the distributable cash flows between the Merger and the end of the year. Finally, I use the agreed-upon WACC of 14.13%, and I adopt Austin Smith's use of the mid-year convention to calculate present value, "which assumes cash flows will be received evenly throughout the period rather than at the end of the period."[313] Based on the foregoing assumptions, I find that the fair value of Nate's 1,320,000 shares in ESG as of the Merger date was $42,165,920.

## B.    Counts I and II: Breach of Fiduciary Duty Against Cannon, Bryn, and Acquisition Corp.

In Count I of the Amended Complaint, Nate contends that Cannon and Bryn breached their fiduciary duties as directors of ESG by approving the Merger as a self-interested and unfair transaction. In Count II of the Amended Complaint, Nate contends that Cannon, Bryn, and ESG Acquisition Corp. breached their fiduciary duties as controlling stockholders of ESG by approving the unfair Merger. Defendants conceded in the Pre-Trial Stipulation that they carry the burden to prove the entire fairness of the Merger under Counts I and II.[314] That was a sensible concession. Cannon and Bryn, as the ESG directors who voted in favor of the Merger, were conflicted in that they had a material interest in paying Nate as little as possible by virtue of their substantial holdings

---

[312] JX 331 (Austin Smith Report) at ¶ 47.

[313] *Id.* at Ex. 3.

[314] Pre-Trial Stip. ¶ VI.C.3.

70

in Acquisition Corp., the surviving corporation in the Merger.[315] Acquisition Corp., as ESG's majority stockholder, also stood on both sides of the Merger.[316] Absent procedural mechanisms not present here,[317] Cannon and Bryn as conflicted directors (under Count I) and Acquisition Corp. as a controlling stockholder (under Count II) bear the burden to prove the entire fairness of the Merger by establishing "to the court's satisfaction that the transaction was the product of both fair dealing and fair price."[318] Because Cannon, Bryn, and Acquisition Corp. presented a single defense of the Merger, the following entire fairness analysis applies to both claims.

### 1.    The Merger Was Not the Product of Fair Dealing

Fair dealing "embraces questions of when the transaction was timed, how it was initiated, structured, negotiated, disclosed to the directors, and how the approvals of the directors and the stockholders were obtained."[319] Nate contends that Cannon and Bryn timed the Merger strategically in two ways: first, to exploit the loss of Viridian as a

---

[315] *See In re Digex Inc. S'holders Litig.*, 789 A.2d 1176, 1207 (Del. Ch. 2000) (concluding that a decision by four directors must be reviewed for entire fairness because those directors "possessed substantial direct, personal financial interests in the proposed transaction").

[316] *See Kahn v. Lynch Commc'ns Sys., Inc.*, 638 A.2d 1110, 1115 (Del. 1994) ("A controlling or dominating shareholder standing on both sides of a transaction, as in a parent-subsidiary context, bears the burden of proving its entire fairness.").

[317] *See Kahn v. M & F Worldwide Corp.*, 88 A.3d 635, 645 (Del. 2014).

[318] *Cinerama, Inc. v. Technicolor, Inc.*, 663 A.2d 1156, 1163 (Del. 1995) (citation omitted).

[319] *Weinberger*, 457 A.2d at 711.

major customer of ESG and thereby cash him out at a low valuation; and second, to deprive Nate of the opportunity to enjoin the transaction in court before it closed.[320]

Defendants counter that the timing of the Merger was dictated by Nate's refusal to negotiate over a cash-out price, and that the one-day notice of the ESG board meeting to approve the Merger, which was permitted under ESG's bylaws, was equitable under the circumstances because Nate already had the 2013 Projections and the Grant Thornton Valuation for over a month. Further, Cannon and Bryn submit that their reliance on a financial expert, Grant Thornton, to determine the Merger price is evidence of fair dealing under 8 *Del. C.* § 141(e).[321]

In my opinion, Defendants failed to demonstrate that the Merger was the product of fair dealing. Instead, I find that Cannon timed the Merger to take advantage of the downward revision from the Revised 2012 Projections to the 2013 Projections, which

---

[320] Pl.'s Op. Br. 25-27.

Nate also argues that the Merger violated the Stockholders' Agreement. Pl.'s Op. Br. 28. Section 10 of the Stockholders' Agreement requires that Nate, Cannon and Bryn unanimously approve any "agreements or transactions valued in excess of Ten Thousand Dollars ($10,000)" and any "material changes in the business of the Company." JX 2 (Stockholders' Agreement) at §§ 10(2)(3), 10(2)(6). Defendants deny that the Stockholders' Agreement barred the Merger and argue, alternatively, that the contracting parties waived those provisions of Section 10 by not enforcing them in the past. Defs.' Ans. Br. 79-82; Tr. 27 (Cannon), 652 (Bryn). Nate counters that the Stockholders' Agreement includes a no-waiver provision. *See* JX 2 (Stockholders' Agreement) at § 17(3). I decline to resolve these issues because the parties did not fully or fairly brief the legal effect of Cannon and Bryn transferring their ESG stock to Acquisition Corp. on the contractual rights and obligations under the Stockholders' Agreement. In any event, the impact of the Stockholders' Agreement would have no practical effect on the outcome of my fairness analysis given my conclusions above.

[321] Defs.' Reply Br. 4-10; Defs.' Ans. Br. 75-79.

were primarily brought about by the loss of Viridian, to cash out Nate and thereby "stop the hemorrhage" [322] of paying millions in profit distributions to Nate, who had not worked at the Company since August 2009.[323] I also find it was inequitable for Cannon and Bryn to reject Nate's reasonable request for a one-day delay of the May 6, 2013, ESG board meeting at which the Merger would be put to a vote.

Under Section 6-4(b) of the Company's bylaws, ESG's board had the authority to convene a special meeting on one day's notice.[324] But, "inequitable action does not become permissible simply because it is legally possible."[325] Nate may have had the 2013 Projections in hand since the end of March 2013,[326] but there is no evidence in the record suggesting that Cannon or Bryn had informed Nate before May 3, 2013, that the 2013 Projections would be the basis for a cash-out transaction.[327] In any event, Nate

---

[322] Tr. 208-09 (Cannon); Cannon Dep. 190.

[323] According to Defendants, the fact that Nate withdrew his claim for rescissory damages before trial meant that Nate himself no longer thought that the Company was worth more after the Merger than on May 6, 2013. Tr. of Oral Arg. 102-03. Defendants offered no authority for taking an adverse inference from Nate's litigation strategy, and I decline to do so here. As with the appraisal analysis, fairness logically should focus on what was known and knowable to the parties at the time of the challenged transaction.

[324] JX 3 (Bylaws of Energy Services Group, Inc.) at § 6.

[325] *Schnell v. Chris-Craft Indus., Inc.*, 285 A.2d 437, 439 (Del. 1971).

[326] JX 264 (Letter from Barry Klickstein to Wayne Dennison (Mar. 28, 2013)) at NO00000042.

[327] *See Pepsi-Cola Bottling Co. v. Woodlawn Canners, Inc.*, 1983 WL 18017, at *13 (Del. Ch. Mar. 14, 1983) (concluding after trial that it was not inequitable for a director to call an impromptu special board meeting where the matters discussed were likely "potential

asked only for a one-day delay to travel (from New York to Maine) and to review the deal documents before the board meeting in Boston. Tellingly, Cannon conceded that he and Bryn refused this request because they wanted to prevent Nate from having the opportunity to go to court to enjoin the transaction.[328]  Because the record does not reveal a legitimate need for such acute timing pressure, Cannon and Bryn's refusal of Nate's reasonable request was inequitable.[329]

In sum, under the totality of the circumstances, Defendants have not proven that the Merger was the product of fair dealing.

## 2.     The Merger Was Not at a Fair Price

Fair price "relates to the economic and financial considerations of the proposed merger, including all relevant factors: assets, market value, earnings, future prospects,

---

topics for discussion" at a noticed board meeting and the annual shareholders meeting scheduled for the same day).

[328] Tr. 121 (Cannon).

[329] Cannon and Bryn's reliance on 8 *Del. C.* § 141(e) is misplaced in my view.  A director's reliance on qualified experts under 8 *Del. C.* § 141(e) is "a pertinent factor in evaluating whether corporate directors have met a standard of fairness in their dealings," but this factor alone is not dispositive of fair dealing.  *See Cinerama. Inc. v. Technicolor, Inc.*, 663 A.2d 1134, 1142 (Del. Ch. 1994), *aff'd*, 663 A.2d 1156 (Del. 1995).  "To hold otherwise would replace this court's role in determining entire fairness . . . with that of various experts hired to give advice to the directors in connection with the challenged transaction[.]"  *Valeant Pharm. Int'l v. Jerney*, 921 A.2d 732, 751 (Del. Ch. 2007). Under the circumstances of this case, where Cannon and Bryn advance the Grant Thornton Valuation based on the 2013 Projections as evidence of fair dealing but simultaneously insist that the 2013 Projections were not reflective of the Company's fair value, I find Cannon and Bryn's reliance on Grant Thornton's bottom line to be unpersuasive.

and any other elements that affect the intrinsic or inherent value of a company's stock."[330]

"When conducting a fair price inquiry as part of the entire fairness standard of review, the court asks whether the transaction was one 'that a reasonable seller, under all of the circumstances, would regard as within a range of fair value; one that such a seller could reasonably accept.' "[331]  The fair price inquiry in a fiduciary duty claim is largely equivalent to the fair value determination in an appraisal proceeding, although the remedies may be different.[332]  Under the DCF valuation set forth above, where I concluded that the fair value of Nate's interest in ESG was $42,165,920, I find that Defendants have failed to show that the $19.95 per share consideration ($26.334 million in total) offered to Nate in the Merger was within a range of fair value of ESG.[333]

### 3. The Merger was not Entirely Fair

Under the entire fairness standard, I must make a unitary conclusion as to whether the Merger was entirely fair.  "[I]n a non-fraudulent transaction . . . price may be the preponderant consideration outweighing other features of the merger."[334]  After weighing

---

[330] *Weinberger*, 457 A.2d at 711.

[331] *See In re Orchard Enters., Inc. S'holder Litig.*, 88 A.3d 1, 30 (Del. Ch. 2014) (quoting *Cinerama*, 663 A.2d at 1143).

[332] *Weinberger*, 457 A.2d at 713-14 (determining fair price under the entire fairness standard by reference to determining fair value in an appraisal proceeding).

[333] *See Emerging Commc'ns,*, 2004 WL 1305745, at *24 (concluding that the merger consideration of $10.25 per share was not a fair price under *Weinberger* where the appraised fair value of the company was $38.05 per share).

[334] *Weinberger*, 457 A.2d at 711.

the respective fair dealing and fair price inquiries, I conclude that the Merger was not entirely fair. Cannon, Bryn, and Acquisition Corp. thus breached their fiduciary duties.

"[W]here a merger is found to have been effected at an unfairly low price, the shareholders are normally entitled to out-of-pocket (*i.e.*, compensatory) money damages equal to the 'fair' or 'intrinsic' value of their stock at the time of the merger, less the price per share that they actually received."[335] This principle plainly applies here. Defendants have not shown that Nate's damages are less than the fair value of his interest in ESG, nor has Nate shown that his damages are greater than the fair value of his interest.[336] Thus, judgment will be entered in Nate's favor under Counts I and II, with Cannon, Bryn, and Acquisition Corp. jointly and severally liable to Nate for damages in the amount of $42,165,920, representing the fair value of Nate's shares.

## C. Count III: Aiding and Abetting Against Acquisition Corp.

In Count III of the Amended Complaint, Nate asserts that Acquisition Corp. is liable for aiding and abetting Cannon and Bryn's breaches of fiduciary duty. Nate waived this claim because he offered no probative evidence at trial and presented no argument in support of this claim in his post-trial briefing.[337]

---

[335] *Strassburger v. Earley*, 752 A.2d 557, 579 (Del. Ch. 2000); *see also Orchard Enters.*, 88 A.3d at 48 ("[T]his court has conducted consolidated breach of fiduciary duty and appraisal proceedings and awarded the same damages measure in both cases.").

[336] *See, e.g.*, *ONTI, Inc. v. Integra Bank*, 751 A.2d 904, 932 (Del. Ch. 1999) ("I find the Counterclaim Defendants dealt unfairly with the Counterclaimants, and the amount of damages equals the fair value I have determined above less the $6,040,000 offered.").

[337] *See In re El Paso Pipeline P'rs, L.P. Deriv. Litig.*, 2015 WL 1815846, at *14 (Del. Ch. Apr. 20, 2015).

## D. Interest, Fees, and Costs

Under 8 *Del. C.* § 262(h), unless I determine otherwise for good cause shown, Nate is entitled to interest at the statutory rate (the Federal Reserve discount rate plus 5%, compounded quarterly) from the effective date of the Merger until the appraised value of his stock is paid. Neither Nate nor ESG has offered any good cause to depart from the statute here. Thus, I award Nate interest at the statutory rate on his appraisal claim, compounded quarterly.

In his post-trial briefing, Nate seeks to recover his expert fees and attorneys' fees incurred in this action, contending that Defendants litigated in bad faith. I disagree that Defendants' conduct rose to the level of bad faith, and I reject this request.

Under the American Rule, litigants in this Court generally pay their own attorneys' fees.[338] "The bad faith exception to the American Rule applies in cases where the court finds litigation to have been brought in bad faith or finds that a party conducted the litigation process itself in bad faith, thereby unjustifiably increasing the costs of litigation."[339] "[T]o constitute bad faith, the [litigant's] action must rise to a high level of egregiousness."[340] The thrust of Nate's request is that the Merger price, unilaterally set by Cannon and Bryn, was unfair on its face and not based on any legitimate valuation of

---

[338] *See Goodrich v. E.F. Hutton Gp., Inc.*, 681 A.2d 1039, 1044 (Del. 1996).

[339] *Beck v. Atl. Coast PLC*, 868 A.2d 840, 850-51 (Del. Ch. 2005).

[340] *Judge v. City of Rehoboth Beach*, 1994 WL 198700, at *2 (Del. Ch. Apr. 29, 1994).

the Company because Grant Thornton failed to tax affect its DCF analysis of the 2013 Projections for ESG as a Subchapter S corporation under *Kessler*.[341]

In my opinion, this conduct does not rise to the level of bad faith to warrant fee shifting because the parties "could and did reasonably differ on the legal import" of several critical issues,[342] such as whether it was appropriate to tax affect ESG's earnings under *Kessler*. For example, the import and application *Kessler* is not free from criticism,[343] nor is it a binding decision of the Delaware Supreme Court. I also rejected several aspects of Austin Smith's valuation, including her discount rate and terminal growth rate, in favor of Jacobs's calculations. None of the authorities Nate has advanced compels me to award expert fees or attorneys' fees. I thus deny Nate's request for fees. Under 8 *Del. C.* § 262(j) and Court of Chancery Rule 54(d), I award Nate his costs.

---

[341] Pl.'s Op. Br. 73-74.

[342] *See In re Sunbelt Beverage Corp. S'holder Litig.*, 2010 WL 26539, at *15 (Del. Ch. Jan. 5, 2010, revised Feb. 15, 2010) (declining to award attorneys' fees under the bad faith exception because the defendants' litigation strategy "was sufficiently reasoned to preclude a finding that there was no legal issue in the case upon which reasonable parties could differ").

[343] *See, e.g.*, Stephen D. McMorrow, *Consider "Tax-Affecting" When Setting the Value of an S Corporation*, 10 Bus. Entities 36, 42-43 (Nov.-Dec. 2008) ("Vice Chancellor Strine gave an admiring nod to research in this area by noting that useful models for valuing S corporations were provided by Chris Treharne and others . . . as well as by Z. Christopher Mercer . . . . The problem with the court's model is that it works only when the S corporation is distributing 100% of earnings."); Bret A. Tack, *At Last, a Valid Way to Value S Corps*, WealthManagement.com (Nov. 1, 2006), http://wealthmanagement.com/valuation/last-valid-way-value-s-corps-0 ("The Delaware Chancery Court's method for capturing the value of the S corp status using a presumed corporate tax rate does not address how the value of the S corp benefits is reduced when earnings are retained in the corporation and not distributed.").

## IV. CONCLUSION

For the foregoing reasons, judgment will be entered in Nate's favor under Counts I, II, and IV of the Amended Complaint. Nate is entitled to: (1) the fair value of his 1,320,000 shares of ESG as of the Merger on May 6, 2013, which I find to be $42,165,920; (2) pre-judgment and post-judgment on this amount at the Delaware legal rate, compounded quarterly; and (3) costs. Judgment will be entered in Acquisition Corp.'s favor under Count III.

Counsel shall confer and submit an implementing order of final judgment within five business days, providing for the foregoing payments to be made within thirty calendar days of entry of judgment.

## APPENDIX A
## ESG Discounted Free Cash Flow Analysis
(in thousands)

| | | | Calendar Year Ending December 31 | | | |
|---|---|---|---|---|---|---|
| | **2013 (A+P)** | **2014P** | **2015P** | **2016P** | **2017P** | **Terminal** |
| EBITDA | $15,019.4 | $15,245.8 | $15,696.4 | $16,644.1 | $17,642.8 | $18,172.1 |
| Less: Depreciation and Amortization | (317.8) | (408.0) | (448.0) | (448.0) | (448.0) | (496.9) |
| EBIT | $14,701.6 | $14,837.8 | $15,248.4 | $16,196.1 | $17,194.8 | $17,675.2 |
| Less: Income Tax | (3,338.7) | (3,369.7) | (3,462.9) | (3,678.1) | (3,904.9) | (4,014.0) |
| **Unlevered Net Income** | **$11,362.9** | **$11,468.1** | **$11,785.5** | **$12,518.0** | **$13,289.9** | **$13,661.1** |
| Plus: Depreciation & Amortization | 317.8 | 408.0 | 448.0 | 448.0 | 448.0 | 497.0 |
| Less: Capital Expenditures | (1,200.0) | (700.0) | (300.0) | (300.0) | (300.0) | (497.0) |
| Less: Additional Working Capital | (25.7) | (104.6) | (43.8) | (45.0) | (45.0) | (63.0) |
| **Unlevered Free Cash Flow** | **$10,455.0** | **$11,071.5** | **$11,889.7** | **$12,621.0** | **$13,392.9** | **$13,598.1** |
| Partial Period Adjustment | 0.66 | 1.0 | 1.0 | 1.0 | 1.0 | 1.0 |
| **Unlevered Free Cash Flow** | **$6,900.3** | **$11,071.5** | **$11,889.7** | **$12,621.0** | **$13,392.9** | **$13,598.1** |

**Present Value of Distributable Cash Flows**

| | | | | | | |
|---|---|---|---|---|---|---|
| WACC | 14.13% | 14.13% | 14.13% | 14.13% | 14.13% | |
| Discount Period (mid-year convention) | 0.33 | 1.16 | 2.16 | 3.16 | 4.16 | |
| Present Value Factor | 0.96 | 0.86 | 0.75 | 0.66 | 0.58 | |
| Present Value of Distributable Cash Flows | **$6,605.8** | **$9,497.8** | **$8,936.9** | **$8,312.1** | **$7,728.4** | |

**Terminal Value**

| | |
|---|---|
| Residual Cash Flow | $13,598.1 |
| WACC | 14.13% |
| Less: Residual Growth Rate | 3.00% |
| Capitalization Rate | 11.13% |

| | |
|---|---|
| Residual Cash Flow | $122,175.65 |
| Present Value Factor | 0.58 |
| **Present Value of Residual Cash** | $70,502.00 |

| | Tax Rate |
|---|---|
| | 22.71% |

**Enterprise Value**

| | |
|---|---|
| PV of Distributable Cash Flows (2013-2017) | $41,081.0 |
| PV of Residual Cash Flows | $70,502.0 |
| Cash and Equivalents | $12,984.0 |
| Enterprise Value | $124,567.0 |
| **Nate's Stock** | **$42,165.92** |
| (33.85% ownership, 1,320,000 shares) | |